Filed 6/9/26  P. v. Tapia CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN TAPIA,<br><br>    Defendant and Appellant. | H052446<br>(Santa Clara County<br> Super. Ct. No. C1775834) |

A jury convicted defendant Juan Tapia of 30 sexual crimes committed against five minors.  The trial court sentenced Tapia to 405 years to life in prison plus one year.

Tapia raises multiple claims of error in this appeal.  Stated broadly, he challenges the trial court's rulings on testimony about U visas,[1] the admission of evidence about child sexual abuse accommodation syndrome

---

[1] "A U visa is 'a temporary nonimmigrant visa' that provides 'legal status for noncitizens who assist in the investigation of serious crimes in which they have been victimized.  [Citations.]'  [Citation.]  '[I]nformation . . . relat[ing] to an alien who is the beneficiary of an application for' a U visa is generally confidential."  (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1267, fn. 1 (*Castaneda-Prado*); see also *Perez Perez v. Wolf* (9th Cir. 2019) 943 F.3d 853, 856–858; 8 U.S.C. §§ 1101(a)(15)(U), 1255(m).)

(CSAAS), the CALCRIM No. 1193 jury instruction on the use of CSAAS evidence, alleged prosecutorial misconduct in cross-examining Tapia and presenting closing argument, the trial court's interactions with the deliberating jury, the effectiveness of defense counsel, and the cumulative prejudice of the alleged errors.

For the reasons explained below, we affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In August 2018, the Santa Clara County District Attorney filed an information charging Tapia with 34 sexual crimes committed against five minors, Sa. Doe, Ja. Doe, St. Doe, A. Doe, and Jo. Doe between November 2003 and October 2017.[2]

Regarding Sa. Doe, the information alleged five counts of forcible lewd or lascivious act on a child under age 14 (Pen. Code,[3] § 288, subd. (b)(1); counts 1–5), five counts of aggravated sexual assault on a child under age 14 by sexual penetration (§§ 269, 289, subd. (a); counts 6–10), and one count of lewd or lascivious act on a child age 14 or 15 (§ 288, subd. (c)(1); count 11). Counts 1 through 10 allegedly occurred about and between November 2003 and November 2007; count 11 allegedly occurred about and between November 2007 and November 2009.

Regarding Ja. Doe, the information alleged five counts of forcible lewd or lascivious act on a child under age 14 (§ 288, subd. (b)(1); counts 12–16)

---

[2] The information identified the minor victims by first name and the pseudonym "Doe." We refer to the minors by the first initial or first two initials of their first names and other persons by their initials (or in two instances, only their first initials) to protect personal privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4), (10)–(11).)

[3] All further unspecified statutory references are to the Penal Code.

and one count of lewd or lascivious act on a child age 14 or 15 (§ 288, subd. (c)(1); count 17).  Counts 12 through 16 allegedly occurred about and between June 2011 and June 2016; count 17 allegedly occurred about and between June 2016 and October 2017.

Regarding St. Doe, the information alleged five counts of forcible lewd or lascivious act on a child under age 14 (§ 288, subd. (b)(1); counts 18–22), five counts of aggravated sexual assault on a child under age 14 by sexual penetration (§§ 269, 289, subd. (a); counts 23–27), and one count of lewd or lascivious act on a child age 14 or 15 (§ 288, subd. (c)(1); count 28).  Counts 18 through 27 allegedly occurred about and between April 2010 and April 2013; count 28 allegedly occurred about and between April 2013 and April 2015.

Regarding A. Doe, the information alleged one count of forcible lewd or lascivious act on a child under age 14 (§ 288, subd. (b)(1); count 29), one count of aggravated sexual assault on a child under age 14 by sexual penetration (§§ 269, 289, subd. (a); count 30), and one count of lewd or lascivious act on a child age 14 or 15 (§ 288, subd. (c)(1); count 31).  Counts 29 and 30 allegedly occurred about and between April 2011 and April 2014; count 31 allegedly occurred about and between April 2014 and April 2016.

Regarding Jo. Doe, the information alleged two counts of lewd or lascivious act on a child under age 14 (§ 288, subd. (a); counts 32 & 33) and one count of lewd or lascivious act on a child age 14 or 15 (§ 288, subd. (c)(1); count 34).  Counts 32 and 33 allegedly occurred about and between January 2010 and January 2013; count 34 allegedly occurred about and between January 2013 and January 2015.

The information additionally alleged as to counts 1 through 5, 12 through 16, 18 through 22, 29, 32, and 33, that Tapia committed the alleged

offenses against multiple victims (multiple victim allegation) (§ 667.61, subds. (b), (e)).

During trial, the trial court granted the prosecutor's motion to dismiss counts 31 and 34.

Jury deliberations lasted five days. On May 8, 2024, the jury found Tapia guilty on all 16 counts of forcible lewd or lascivious act on a child under age 14 (§ 288, subd. (b); counts 1–5 [Sa. Doe], 12–16 [Ja. Doe], 18–22 [St. Doe] & 29 [A. Doe]), 10 counts of aggravated sexual assault on a child under age 14 (§ 269; counts 6–10 [Sa. Doe] & 23–27 [St. Doe]), two counts of lewd or lascivious act on a child age 14 or 15 (§ 288, subd. (c); counts 11 [Sa. Doe] & 28 [St. Doe]), and two counts of lewd or lascivious act on a child under age 14 (§ 288, subd. (a); counts 32 & 33 [Jo. Doe]). The jury found true the multiple victim allegations attached to counts 1 through 5, 12 through 16, 18 through 22, 29, 32, and 33. The jury did not return a verdict on counts 17 (§ 288, subd. (c)(1) [Ja. Doe]) and 30 (§§ 269, 289, subd. (a) [A. Doe]). The trial court declared a mistrial as to those counts and dismissed them upon request of the People.

On July 12, 2024, the trial court sentenced Tapia to an aggregate indeterminate term of 405 years to life in prison plus a one-year determinate term. The total sentence comprises consecutive terms of 15 years to life on counts 1 through 10, 12 through 16, 18 through 27, and 29, to be served consecutively to concurrent terms of 15 years to life on counts 32 and 33, and consecutively to concurrent one year terms on counts 11 and 28.

B. *Evidence Presented at Trial*

1. Prosecution Evidence

Born in 1970, Tapia was in his 30's and 40's at the time of the alleged crimes and 54 years old at the time of his 2024 trial.

The prosecution presented evidence that between approximately 2005 and 2017, Tapia sexually abused his girlfriend E.M.'s daughters (St. Doe and Ja. Doe), E.M.'s younger sister (Sa. Doe), and E.M.'s nieces (Jo. Doe and A. Doe).

a. Evidence of Crimes Against St. Doe

St. Doe was 24 years old and a county child protective services (CPS) social worker at the time of trial.

While growing up, St. Doe lived at a duplex in San Jose with her mother E.M. and younger sibling (by three years) Ja. Doe. St. Doe's maternal grandparents lived in the front house of the duplex. Other relatives also lived at the duplex, including St. Doe's aunt (Sa. Doe), and St. Doe's maternal cousins (sisters Jo. Doe and A. Doe). Sa. Doe is a few years older that St. Doe, and Jo. Doe and St. Doe were the same age.

When St. Doe was five or six years old (in 2004 or 2005), Tapia began living with St. Doe's family at the duplex. The family eventually moved into the back house of the duplex, and Tapia and E.M. had two children together, J. (who is about seven years younger than St. Doe) and B. (who is about 10 years younger than St. Doe).

According to St. Doe, E.M.'s and Tapia's relationship initially was fine. Later, Tapia drank alcohol and became abusive toward E.M. Tapia yelled, screamed, hit E.M., pulled her hair, and threw things at E.M. approximately three or four times a month. St. Doe intervened sometimes, and Tapia would push St. Doe out of the way.

St. Doe testified that Tapia began sexually abusing her when she was 11 years old. Before that, Tapia "smack[ed]" her butt, hugged her tightly, and placed his hands on her breasts or butt while wrestling her. St. Doe's first memory of Tapia's abusive conduct involved Tapia placing St. Doe on his

5

lap in their living room (on an evening when E.M. was at work), moving St. Doe's body against his erect penis, and placing his hands under her shirt toward her breasts.

When St. Doe was 11 or 12 years old, Tapia began placing his hands under St. Doe's shirt and pants, touching her breasts or butt, and moving his fingers toward her vagina. This abuse occurred in Tapia's and E.M.'s bedroom approximately twice a week for a month or two (while E.M. was working the night shift). When St. Doe was age 12, Tapia began touching St. Doe under her underwear (in the bedroom), and the abuse "escalated from there" to Tapia putting his fingers inside St. Doe's vagina. Tapia also placed St. Doe's hand on his erect penis, over his clothes, about four times.

St. Doe felt physical and mental pain and betrayal the first time Tapia put his fingers into her vagina. Tapia placed his fingers inside St. Doe's vagina 10 to 15 times, once or twice a week. The repeated abuse caused St. Doe to feel pain and soreness and to bleed during urination. Tapia told St. Doe not to tell anyone about the abuse.

Tapia's actions scared St. Doe. She sometimes pretended to be asleep, moved her body around, held onto the sheets, and tried to pull down her shirt or pull up her pants to stop the abuse. Tapia forcibly held St. Doe, spread her legs, and pulled on her clothing to perpetrate the abuse. St. Doe told Tapia " 'no' a couple of times," but she feared Tapia because she had seen "him be aggressive or violent towards [her] mom."

When St. Doe was age 13, she resisted going into Tapia's bedroom. Tapia told E.M. that St. Doe did not want to help take care of her younger brother B. (who slept in the bedroom with Tapia and E.M.). St. Doe's sister Ja. Doe then "started to have to go into the room" [to babysit].

6

St. Doe testified that when she was approximately age 14, Tapia put his mouth on her breast. In addition, when St. Doe was 14 or 15 years old, Tapia entered St. Doe's bedroom, removed a towel that she had wrapped around her body, and rubbed her breasts and nipples.

St. Doe thought no one would believe her if she disclosed Tapia's misconduct. St. Doe was skeptical about her mother E.M., because E.M. remained in an abusive relationship with Tapia and once told one of St. Doe's aunts "to leave it alone" when the aunt had said something about Tapia. In addition, E.M. taught St. Doe not to talk about sex. Once, when St. Doe was 13 or 14 years old, E.M. became upset and defensive when asking St. Doe and Ja. Doe if Tapia had touched them. Because of E.M.'s demeanor, St. Doe did not think E.M. would believe any disclosure, so St. Doe responded no to her mother's question about touching and walked away; Ja. Doe cried. Furthermore, St. Doe feared that Tapia might hurt her or her mother if she (St. Doe) disclosed the abuse. Tapia earned money for the family and "controlled the finances." St. Doe also feared that her "undocumented" mother might be deported and St. Doe would have no place to live. Eventually, St. Doe told herself she "just need[ed] to get out" of the house. She worked hard on her academics so she could go away to college.

St. Doe first disclosed Tapia's wrongdoing at age 18 (in October 2017), during a conversation at a restaurant with her sister Ja. Doe, her aunts B.M. and Sa. Doe, and Sa. Doe's girlfriend (hereafter, the restaurant conversation). When one of the conversation's participants asked St. Doe why she decided to go away to college, St. Doe said that she wanted to leave home and did not like Tapia. B.M. stated that her daughter Jo. Doe had told her (B.M.) about an incident involving Tapia. B.M. asked St. Doe and Ja. Doe if Tapia had ever touched them inappropriately. Ja. Doe began to cry. This gave St. Doe

7

"the courage" to say " 'me too.' " Sa. Doe stated that she would report Tapia to the police to "prevent it from happening to" Tapia's youngest children J. and B.

St. Doe was scared and initially did not want Sa. Doe to report the abuse because St. Doe thought her mother was going to get into trouble. Sa. Doe reassured St. Doe that everything would be fine. St. Doe spoke to the police a few days after the restaurant conversation.[4] St. Doe felt "relief," but she was "still worried and scared." She also hated herself for not saying something earlier because "[m]aybe something would have happened and we'd have gotten help."

b. Evidence of Crimes Against Ja. Doe

Ja. Doe was 21 years old and working in special education at the time of trial.

Ja. Doe had a "normal relationship" with Tapia until she was nine or 10 years old (in 2011 or 2012). Tapia was the "provider" for the family, but he also "was a big drinker" and hit Ja. Doe's mother E.M.

To Ja. Doe's best recollection, Tapia began touching her "private areas" (i.e., breasts and vagina) when she was approximately nine or 10 years old. One of the first touching incidents occurred when E.M. was working the night shift and Tapia brought Ja. Doe from her bedroom to his bedroom—ostensibly for Ja. Doe to sleep there with B. after Tapia left for work. Ja. Doe recalled that Tapia "would start by touching [her] above [her] clothing, and then he would move on to pulling down [her] bottoms . . . and he would touch [her] above [her] underwear. But there were times where he would also pull them

_____

[4] San Jose Police Detective Daniel Krauss interviewed St. Doe in person on October 24, 2017. According to Detective Krauss, St. Doe was initially hesitant to speak, scared, and emotional, but she remained "fairly calm" and was "very forthcoming."

down and touch [her] skin to skin" on her breasts or vagina. Tapia touched Ja. Doe's vagina with "pressing motions," but he did not insert his fingers into her vagina. Tapia also squeezed Ja. Doe's breasts.

Tapia touched Ja. Doe in this manner more than five times over a two year period. Ja. Doe often tried to "pull away" from Tapia and close her legs, but Tapia responded by grabbing Ja. Doe, pulling her back, and opening her legs. B. was asleep in the bedroom when the abuse occurred.

Once, while Ja. Doe was in a pool behind the back house with her cousin A. Doe, Tapia entered the pool, touched Ja. Doe's breast over her clothes, groped A. Doe's breast, and exposed his penis to the girls (hereafter, the pool incident).

Ja. Doe was scared and confused by Tapia's actions. Tapia "would tell [Ja. Doe] that it was okay and that what he was doing wasn't anything wrong." Ja. Doe believed him. Tapia gave Ja. Doe money three or four times after abusing her. He also suggested that she could buy things (such as ice cream) for herself or her siblings. In addition, he told Ja. Doe, " 'Don't say anything.' "

At one point during the two-year period of abuse, E.M. (in the presence of her sister, J.M.) asked Ja. Doe if Tapia "had ever done anything to" her. Ja. Doe disclosed that Tapia had touched her. E.M. continued her relationship with Tapia after Ja. Doe's disclosure. This made Ja. Doe "feel like what [Tapia] was doing to [her] was indeed nothing wrong and so [she] didn't try to tell her [mother] anything anymore." Eventually, Ja. Doe realized that Tapia's actions were "not something normal." She thought about disclosing the abuse, felt ashamed, and remembered Tapia saying that what he was doing was okay.

9

From the time Ja. Doe was in the eighth grade until shortly before she spoke to the police about the abuse (during her sophomore year of high school), Tapia smacked Ja. Doe's butt more than once.

Regarding the restaurant conversation, Ja. Doe recalled her aunt Sa. Doe mentioning that Tapia had touched her and asking if Tapia had touched Ja. Doe and St. Doe. Ja. Doe "automatically started crying" in response to Sa. Doe's question. Ja. Doe was reluctant to go to the police because Tapia "was still the main provider" at home and Ja. Doe was concerned that her mother would not be able to provide for the family. Ja. Doe decided to speak to the police out of concern for her younger sister J.

c. Evidence of Crimes Against Sa. Doe

Sa. Doe was 30 years old and a teacher at the time of trial.

In 2004, around when Sa. Doe started middle school, Sa. Doe and her family (including her sister E.M. and her children) moved into the duplex. Around this time, E.M. and Tapia began their relationship, and Tapia eventually moved to the duplex. Sa. Doe initially thought Tapia "seemed nice" because he extended invitations for Sa. Doe to do things with his family.

Sa. Doe testified that Tapia sexually abused her at least 100 times. The abuse began soon after Tapia moved to the duplex (while Sa. Doe was still in middle school). Tapia would say to Sa. Doe that he was wrestling with her and teaching her "how to be with a man." Tapia groped Sa. Doe's breasts and other body parts, pushed his body against hers, got on top of her, and pushed her down. Tapia treated his behavior as if it was "a game" and normal. When Sa. Doe asked Tapia why he was doing these things, he said "that's how girls learn" to be with men or do sexual things. He also told Sa. Doe "not to tell anyone."

10

Tapia eventually touched Sa. Doe at least once a week, mostly in the living room of the duplex's back house. The touching progressed from hugging, to kissing and groping, to lifting Sa. Doe's shirt or pulling on her pants and placing his hands under Sa. Doe's clothing. Tapia touched Sa. Doe's bare breasts "[p]robably more than 50" times. Sa. Doe eventually tried to "pull away" or "minimize" her body when Tapia touched her, but Tapia "didn't care" and continued touching Sa. Doe. Tapia's actions "just felt wrong" and made Sa. Doe sad. Tapia kissed Sa. Doe on her lips and other parts of her body "[a]lmost every time" he touched her. He kissed her bare breasts at least 30 times.

Around when Sa. Doe was age 13, Tapia began touching Sa. Doe's vagina with his hands, either over or under her pants, doing so mostly on a couch. "He would rub or stick his hands in and rub, and sometimes he would stick his fingers in." Tapia would tell Sa. Doe to sit on the couch or guide her toward the couch to abuse her. Tapia placed his fingers inside Sa. Doe's vagina "probably around 50 times." In addition, Tapia often pushed his erect penis against Sa. Doe's body while they were clothed. Tapia made Sa. Doe touch his penis, over or under his clothing, "[p]robably at least 15" times.

Once, when Sa. Doe was 14, Tapia climbed onto a balcony and entered Sa. Doe's bedroom while she was watching television. As he had done in the past, Tapia smiled at Sa. Doe, kissed her, touched her breasts, body, and vagina, and pulled down her pants and underwear. Tapia also "kept insisting" to insert his penis into Sa. Doe's vagina. Sa. Doe told Tapia no and said she did not want that. Eventually, they heard a noise in the house. Tapia put his clothes back on and exited the room by way of the balcony. This bedroom incident is Sa. Doe's last memory of Tapia's abuse.

11

Sa. Doe did not disclose Tapia's abuse even after she realized it was wrong because she did not know how to do so, "felt like [she] was to blame for not saying anything sooner," did not want to upset her family, was told to obey adults, and did not think the police would be able to do anything because it involved only her.

When Sa. Doe was in high school, she disclosed to her mother M.M. and sister E.M. that Tapia "did stuff" to her (Sa. Doe). This disclosure occurred after Sa. Doe heard M.M. and E.M. arguing when Jo. Doe had disclosed that Tapia tried to kiss her. M.M. and E.M. argued with Jo. Doe and Sa. Doe about their disclosures, and E.M. thereafter continued her relationship with Tapia. Sa. Doe felt that M.M. and E.M. did not care about protecting the children. Shortly after this initial disclosure, Sa. Doe asked St. Doe and Ja. Doe if anything had happened to them. They "looked down" and "tried to nod no slightly." Sa. Doe told St. Doe and Ja. Doe to inform Sa. Doe or someone else if anything were to happen with Tapia or anyone.

During the restaurant conversation in October 2017, Sa. Doe related that Tapia had touched her and asked if anything had happened to St. Doe and Ja. Doe. In response, St. Doe and Ja. Doe cried and "nodded yes." Sa. Doe asked St. Doe and Ja. Doe if they wanted to go to the police. Sa. Doe spoke to the police a few days later and accompanied St. Doe, Ja. Doe, Jo. Doe, and A. Doe to the police station. The police interviewed them separately, and Sa. Doe did not provide details to her family members of the abuse she had suffered.[5] Speaking to the police was difficult for Sa. Doe because she blamed herself and felt like she had failed the others.

---

[5] San Jose Police Officer Manny Vasquez testified that Sa. Doe, Jo. Doe, and Ja. Doe appeared at the police department on October 16, 2017, and reported child molestation. Officer Vasquez asked each of them, separately,

12

d. Evidence of Crimes Against Jo. Doe [6]

While growing up, Jo. Doe lived in her grandmother M.M.'s home, next door to Tapia. Tapia initially engaged in "play fighting" with Jo. Doe, which she did not think was inappropriate.

When Jo. Doe was 12 or 13 years old, Tapia began touching Jo. Doe inappropriately on the top of her breasts. According to Jo. Doe, this touching happened "[j]ust like once or twice" and she did not "quite remember." During the touching, Tapia tried to touch more than just the top of Jo. Doe's breasts. Tapia would move his hand further down, but Jo. Doe moved away from him. Tapia would "laugh" and call Jo. Doe beautiful.

Jo. Doe spoke to the police in October 2017 and told them about a time that Tapia kissed her and "tried to put his tongue down [her] mouth." On this occasion, Tapia poked Jo. Doe, play fought with her, and kissed her. He "was a little drunk" at the time. Jo. Doe immediately told her grandmother M.M. M.M. thought Jo. Doe was "playing" and seemed "mad." M.M. told Jo. Doe not to "mak[e] up stuff" and did nothing about Jo. Doe's disclosure. Later, Jo. Doe saw M.M. and E.M. speaking. E.M. stared at Jo. Doe.

Tapia continued touching Jo. Doe's chest after the kissing incident. Jo. Doe did not disclose the chest touching because she did not think she would be believed.

Shortly before Jo. Doe spoke to the police in October 2017, Jo. Doe's mother B.M. asked Jo. Doe if she wanted to report Tapia's conduct. Jo. Doe went to the police department with her aunt Sa. Doe and cousin Ja. Doe.

_____

"a series of intake questions" and referred the matter to the sexual assaults unit. Ja. Doe cried and was very sad when she spoke to Officer Vasquez.

[6] Before Tapia's trial, in February 2020, Jo. Doe died in car accident (at age 21). Jo. Doe's preliminary hearing testimony (from July 2018) was read to the jurors. Jo. Doe was 19 years old at the time she testified.

e.   Evidence of Crimes Against A. Doe

A. Doe was 24 years old and worked at a restaurant at the time of trial.

A. Doe is Jo. Doe's younger sister (by about one year).  A. Doe and her family lived at the duplex with her grandparents and other relatives for a time while A. Doe was young.  Tapia lived in the duplex's other house with A. Doe's aunt E.M. and her children.

A. Doe testified that Tapia touched her in her "private part" (i.e., her vagina) while she was living at the duplex during elementary school.  Tapia "would [] caress [A. Doe's] vagina with his fingers."  The touching happened "about two times."

Regarding the pool incident (recounted earlier in the trial by Ja. Doe), A. Doe recalled that when she was living at the duplex, Tapia approached A. Doe and Ja. Doe, had "regular conversation" with them, and "then he started touching -- like trying to touch [A. Doe]."  Tapia initially touched A. Doe's vagina over her swimsuit.  A. Doe moved away from Tapia and told him that she did not like what he was doing and he should leave them alone. Tapia pulled A. Doe back toward himself and slipped his fingers under A. Doe's swimsuit onto her bare vagina, placing his fingertips between her vagina's lips.  A. Doe pulled away from Tapia, and she and Ja. Doe exited the pool.  A. Doe did not recall seeing Tapia's penis during this incident, and she stated (on cross-examination) that Tapia did not enter the pool.  A. Doe recalled telling an adult (whom she could not recollect) about this incident. A. Doe also recalled being told "that we're just little girls making stuff up."

After the pool incident, Tapia once entered Ja. Doe's room while A. Doe was there watching television, made conversation with A. Doe, "started off" touching her "shoulders, went down with his . . . hands, slithered down

14

through [her] body, and [] put[] his hand underneath [her] pants." Tapia next placed his fingers under A. Doe's underwear and touched her "clit area."

A. Doe testified that the abuse she suffered "still hurts" and it is something she tries "not to remember but it's hard."

f. Other Witness Testimony

B.M. was 46 years old when she testified at Tapia's trial. B.M.'s parents brought her to California when she was around five years old. B.M. testified that she is "close" with her younger sister E.M.

B.M. recalled that when she was living at the duplex, E.M. began dating Tapia. Tapia was outgoing, funny, and well liked by B.M.'s family. B.M.'s daughters Jo. Doe and A. Doe spent time at the duplex when their grandmother M.M. took care of them for B.M. (a "single mom" who worked two jobs).

When Jo. Doe was around 11 or 12 years old, she told B.M. that Tapia had tried to kiss her (Jo. Doe). B.M.'s mother M.M. was present. "[T]hey were . . . in disbelief." B.M. told Jo. Doe, " 'Just don't go near him.' "

B.M. recalled being involved in a conversation around 2017, during which she learned about Tapia having "tried something with [her] nieces" and her sister Sa. Doe. Later, A. Doe told B.M. for the first time that she (A. Doe) had suffered some abuse.

Clinical and forensic psychologist Dr. Tiffany Anderson testified as an expert on CSAAS. We describe her testimony further below. (See pt. II.B.1.b.)

2. Defense Evidence

Tapia called two of his 21-year-old nieces to testify about his good character. Each niece stated that she had known Tapia for her entire life,

15

never saw him do anything sexually inappropriate, and did not know him to have a reputation for being sexually inappropriate.

Tapia testified in his own defense. He denied having sexually assaulted or molested anyone involved in this case. He added that he was never alone with the children (excepting his own, J. and B.).

Tapia met E.M. in 2005. After dating for three months, E.M. became pregnant with J. and in 2006, Tapia moved into the back house of the duplex with E.M. St. Doe and Ja. Doe continued living in the front house for a time and eventually moved into the back house. E.M.'s and Tapia's son B. was born in 2008.

Tapia testified (over the prosecutor's objection) that Sa. Doe is "saying what she's saying" against him "[b]ecause her sister is trying to" "[g]et her visa, the U-visa."[7] Tapia denied that he ever "play wrestle[d]" or was ever alone with Sa. Doe. Tapia also denied climbing into Sa. Doe's bedroom.

Tapia further denied that he ever woke St. Doe or Ja. Doe in the morning to have them watch B. in Tapia's and E.M.'s bedroom. Tapia left for work at 5:30 a.m., and E.M. worked the night shift only on Friday and Saturday. On those days of the week, when Tapia left for work, he dropped the children off at the front house to be watched by their grandmother. Tapia additionally denied "bringing the girls into the [bed]room at any point."

Tapia testified that he had good, father/daughter relationships with St. Doe and Ja. Doe. Tapia believed St. Doe and Ja. Doe were "being

---

[7] In the prosecution's rebuttal case, San Jose Police Detective Tony Vera testified that when he interviewed Tapia in October 2017, Tapia denied the allegations against him and "mentioned something about [the victims] getting together to make this story up because they wanted to get back at him for some reason." Tapia never mentioned anything about a U visa.

manipulated" to make the abuse allegations. Tapia denied ever touching Ja. Doe.[8]

Tapia testified that he did not spend much time with Jo. Doe, describing her as "kind of a gossipy and problematic type of child." Tapia denied kissing Jo. Doe. He explained that he avoided Jo. Doe at family gatherings because, after she had reported that he tried to kiss her, he "didn't want them to come near the house, and [he] didn't want them to come near [him]." Tapia further explained that Jo. Doe had made her false report about kissing on a day that he went for a run around the block with Sa. Doe and A. Doe—excluding Jo. Doe because she was "the type of child that doesn't listen to you." According to Tapia, B.M. was at work when this alleged kissing incident occurred. Later, Tapia explained to B.M. "what was going on" and B.M. said, " 'Don't you worry. You know how this girl is.' " Subsequently, B.M. told Jo. Doe not to go near Tapia, and he avoided Jo. Doe and A. Doe. Tapia denied that the pool incident occurred.

On cross-examination, Tapia denied that he ever got "physical" with E.M. or that St. Doe ever had to intervene during any domestic violence incident. Tapia also denied drinking "a lot" while living at the duplex and said that witness statements to the contrary were a "[l]ie." Tapia further testified that he believes Sa. Doe (since age 14) has falsely accused him of touching her because he did not allow her to bring St. Doe's dog inside the house (hereafter, dog incident).[9] Tapia explained that he had invited Sa. Doe's parents over to talk about Sa. Doe's initial accusation, but "they

---

[8] In the prosecution's rebuttal case, Detective Vera testified that during a pretext call between Ja. Doe and Tapia, Tapia denied molesting Ja. Doe, and she reacted by becoming "very distraught."

[9] Tapia had told Detective Vera about the dog incident during the October 2017 police interview.

17

wouldn't." According to Tapia, M.M. additionally did not believe Jo. Doe's disclosure about him.

Tapia believed that all the victims were lying about him. He explained that Sa. Doe is manipulating the victims because she is mad at him about the dog incident and that the "root of this lie" is "because of a U-visa" for Sa. Doe's sisters. Tapia acknowledged that "[s]o far," there had been no evidence of "any such visa" and added that his "wife [E.M.] has been able to get a permit." When the prosecutor asked if Tapia was "saying that because someone else wanted to get a visa, [Sa. Doe]'s making up all these lies," Tapia responded, "Yes, because she was upset because of the dog."

In response to a question posed by a juror about why Tapia thought "the children are being manipulated by the adults," Tapia said, "Because of what I said about the U-visa that they want." Further, when a juror asked, " 'How would [Sa. Doe] benefit to get a U-visa by this allegation?' " Tapia reiterated, "She's not seeking a benefit for herself but for her sisters" E.M. and B.M. In addition, regarding Tapia's stated fear of being alone with St. Doe and Ja. Doe, Tapia testified that he was "afraid of being accused of something, and [St. Doe and Ja. Doe] did it anyway. Because when their mom was deported, she was absent for one month, and the girls went to their grandmother at that time."

On further redirect examination, Tapia testified that before the accusations were leveled against him, he believed neither E.M. nor B.M. had a visa and they were trying to obtain visas. In addition, Tapia said he thinks "they can get a visa based on the accusations."

On recross-examination, Tapia said that he learned about U visas "through other people who got their status or visa and then they told them." Tapia acknowledged, "They're rumors, but it's true because they got their

18

visa." He added, "They're doing this because they need -- that's why they're doing this against me." When the prosecutor asked if Tapia's opinion about U visas was based on information told to him by others, Tapia said "Yes." He further acknowledged that he had not seen any application for a U visa in this case, "but [he had] heard about it."[10]

E.M. and M.M. did not testify at trial.

## II. DISCUSSION

Tapia raises nine claims on appeal. He contends: (1) the trial court erred in restricting his cross-examination of witness B.M. about U visas; (2) the trial court erred by conducting an ex parte hearing with B.M. under Evidence Code section 351.4; (3) the trial court erred by excluding Tapia's testimony regarding U visas; (4) the trial court abused its discretion in admitting expert testimony on CSAAS; (5) the trial court erred by instructing on CSAAS with CALCRIM No. 1193 (CALCRIM 1193); (6) the prosecutor committed prejudicial misconduct in cross-examining Tapia and during her closing argument; (7) the trial court erred by intruding into the deadlocked jury's deliberation; (8) if any of his claims are deemed waived or forfeited, his defense counsel's inadequate objections amount to ineffective assistance of counsel (IAC); and (9) the alleged errors were cumulatively prejudicial.

We address Tapia's claims in turn, except for his alternative IAC claim, which we need not consider because we address the merits of all other claims

---

[10] After Tapia completed his testimony, the trial court recounted for the record that it had decided (during an off the record discussion) to allow Tapia " 'to explain his reasons why he thinks the girls [are] making this up.' " The court added that it had approved cross-examination and rebuttal evidence by the prosecutor about visas and had said that the court would not strike Tapia's testimony about visas because " '[h]e gets the opportunity to give his reasons for why he thinks they're making it up.' "

raised. We group Tapia's first three claims regarding the U visa evidence, as well as his next two claims related to the CSAAS evidence.

A. *Claims Regarding U Visa Evidence*

1. Additional Background Regarding B.M.'s Testimony

At a sidebar discussion during B.M.'s cross-examination, defense counsel asked for permission to explore B.M.'s "immigration status because [counsel] believe[d] it may have some relevance to her testimony and maybe her actions in this case." The prosecutor responded by saying, inter alia, " 'You can't go into that topic without giving prior notice.' " The trial court suggested they " 'find out' " more information and " 'figure out where we go from there.' "

During further discussion on the record, in open court and outside the presence of the jury, the prosecutor added that under Evidence Code section 351.4, "the appropriate way for the [c]ourt to find out is actually in camera" without anyone present.[11] The prosecutor further asserted that "the relevance of this evidence is very minimal, and the likelihood of undue prejudice is significant. So the mere existence of a visa I don't think is probative in this case unless it has something to do with this case."

Defense counsel responded that because "some of the witnesses have mentioned the reason they didn't speak was fear of deportation," he believed

_____

[11] Evidence Code section 351.4, subdivision (a) provides: "In a criminal action, evidence of a person's immigration status shall not be disclosed in open court by a party or their attorney unless the judge presiding over the matter first determines that the evidence is admissible in an in camera hearing requested by the party seeking disclosure of the person's immigration status." The statute does not apply to cases in which a person's immigration status is necessary to prove an element of the offense or an affirmative defense, limit discovery in a criminal action, or prohibit a person or their attorney from voluntarily revealing the person's immigration status to the court. (*Id.*, subd. (b)(1)–(3).)

20

that "goes specifically to potential immigration status." Counsel further noted his belief that "no one's been deported" and "people now have visas," adding "that could be a reason for why allegations or statements are made. [¶] Obviously a person can be entitled to a visa if certain family members are alleged victims. So I think it's probative to ask that question to find out more information in relation to that." The trial court explained that it was "going to gather the information in camera" and then let counsel know "the next step." Defense counsel did not object to the court's proposed course of action.

Thereafter, "a discussion was had off the record." Although the record is not completely clear, it appears that this discussion involved the trial court questioning B.M. off the record, without the parties present. Next, the court spoke at sidebar with counsel for the parties. Back on the record, the court informed B.M. that "nobody's going to ask you about that" and released B.M. for the lunch recess. The court then added for the record, "The [c]ourt conducted an in camera inquiry of the witness, and it turns out she has no visa, and therefore, it's not a relevant issue for the attorneys to ask because the [d]efense was assuming that she had a visa that was given to her in exchange for her being an alleged victim of sexual assault." The court further stated that B.M. "said she didn't even know what a U-visa was." Defense counsel did not object to the court's ruling and said he had no further questions for B.M.

2. Challenge to Restriction of B.M.'s Cross-examination

Tapia contends the trial court abused its discretion and violated his constitutional rights by restricting his cross-examination of B.M. about U visas. He asserts that evidence of a witness's expectation or hope of a U visa is relevant and admissible to show bias and the probative value of such

21

evidence was not substantially outweighed by the danger of undue prejudice, consumption of time, or confusion.

### a. Legal Principles

Evidence Code section 351.4, subdivision (a) restricts the disclosure of evidence of a person's immigration status in open court (with certain exceptions not relevant here) "unless the judge presiding over the matter first determines that the evidence is admissible in an in camera hearing requested by the party seeking disclosure of the person's immigration status." The statute does not define the term "in camera." (See *id*., § 351.4.) "No evidence is admissible except relevant evidence." (*Id*., § 350.) Relevant evidence includes "evidence relevant to the credibility of a witness . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id*., § 210.)

Generally, "[a] party may cross-examine a witness about the witness's motive and bias." (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1050 (*Villa*), citing Evid. Code, § 780, subd. (f).) Evidence of a witness's application for a U visa may be relevant for impeachment. (*Villa*, at p. 1052.)

Evidence Code section 352 provides the trial court discretion to exclude otherwise admissible evidence, "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " '[T]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 301.)

"A criminal defendant's constitutional right to confront witnesses is violated when the court prohibits the defendant from conducting otherwise appropriate cross-examination designed to show a prototypical kind of bias on the witness's part, and thereby provide the jury with facts from which it could appropriately draw inferences regarding the witness's reliability.  But not every restriction on a defendant's cross-examination violates the Constitution.  The trial court retains wide latitude to restrict repetitive, prejudicial, confusing, or marginally relevant cross-examination.  Unless the defendant can show that the prohibited cross-examination would have created a significantly different impression of the witness's credibility, the trial court's exercise of discretion to restrict cross-examination does not violate the constitutional right of confrontation."  (*People v. Sánchez* (2016) 63 Cal.4th 411, 450–451 [citing, among other cases, *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680]; see also *Olden v. Kentucky* (1988) 488 U.S. 227, 232; *People v. Brown* (2003) 31 Cal.4th 518, 545.)

Similarly, a defendant has a "due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense."  (*People v. Cunningham* (2001) 25 Cal.4th 926, 999 (*Cunningham*).)  "Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right."  (*Ibid*.)  " 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' "  (*People v. Blacksher* (2011) 52 Cal.4th 769, 821 (*Blacksher*).)

Generally, "[a] trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless

23

the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 705; see also *People v. Clark* (2011) 52 Cal.4th 856, 932; *People v. Young* (2019) 7 Cal.5th 905, 931.)

Tapia asserts that the trial court's preclusion of questioning related to B.M.'s immigration status and any U visa for herself or a family member infringed his constitutional rights to confrontation, compulsory process, and due process. In turn, he contends that de novo review applies to the question whether the trial court's restriction of cross-examination violated his constitutional rights. The Attorney General mentions only the abuse of discretion standard of review in responding to Tapia's claim of error and does not respond specifically to Tapia's assertion that de novo review applies to the alleged constitutional violations.

We assume for the purposes of deciding this claim that the de novo standard of review applies to determining whether the trial court's restriction on cross-examination created a significantly different impression of B.M.'s credibility or was so extensive as to violate Tapia's constitutional rights. (See *Castaneda-Prado*, *supra*, 94 Cal.App.5th at pp. 1282–1283; see also *People v. Seijas* (2005) 36 Cal.4th 291, 304; *People v. Mayo* (2006) 140 Cal.App.4th 535, 553.)

### b. Analysis

We are not persuaded that the trial court's preclusion of cross-examination by Tapia's counsel about B.M.'s immigration status and knowledge of U visas violated any state evidentiary rules or constitutional protections.

We discern no support in the record for Tapia's appellate assertion that if he had been allowed to question B.M., she "might have acknowledged

conversations with one or more of the complaining witnesses about the possibility that their helpfulness to the prosecution and law enforcement might result in visas for their mothers."

We acknowledge that Tapia "does not accept as dispositive the trial court's report of" B.M.'s statements that "she has no visa" and "didn't even know what a U-visa was." Nevertheless, Tapia failed to offer anything in the trial court to rebut B.M.'s statement that she had no knowledge of U visas. Tapia's defense counsel only asserted vaguely that "some of the witnesses" had failed to disclose the abuse because of deportation fears, that he knew "no one's been deported," and that he had "information" that some unspecified persons (whom counsel referred to as "they") "believe people now have visas."

Defense counsel's assertions do not constitute substantial evidence that would support a factual finding that B.M. believed her participation in this case would help her or anyone else obtain a U visa or other lawful immigration status. Hence, the trial court could properly rely on B.M.'s statements to deem the proposed cross-examination to be collateral and irrelevant. (See *People v. Harris* (1989) 47 Cal.3d 1047, 1091 [concluding that "the trial court did not abuse its discretion in" excluding evidence of a witness's potential motivation to lie "[i]n the absence of any offer of proof by [the] defendant" to support that claim]; *People v. Pearson* (2013) 56 Cal.4th 393, 456 (*Pearson*) [concluding there was no abuse of discretion in precluding cross-examination regarding bias where counsel's proffer of bias was speculative]; see also *People v. Dyer* (1988) 45 Cal.3d 26, 50 ["In the absence of proof of some agreement which might furnish a bias or motive to testify against defendant, the fact that each witness had been charged with the commission of unrelated offenses was irrelevant."].)

25

Tapia's reliance on *Castaneda-Prado* to support his claim of error is unavailing because the circumstances in that case are materially distinguishable from this matter. In *Castaneda-Prado*, the witness "believed that, by accusing [the defendant] of sexual molestation, she was helping her mother obtain a 'U visa.' " (*Castaneda-Prado, supra*, 94 Cal.App.5th at p. 1267.) As discussed, the instant record contains no basis to conclude that a similar belief was held by B.M. or that B.M. knew a person involved in the prosecution was motivated to participate by the prospect of a U visa.

Tapia fails to make a nonspeculative showing that the examination would have produced relevant and probative impeachment evidence. On this record, we conclude that the trial court did not err in precluding Tapia's proposed cross-examination of B.M. We likewise conclude that Tapia's constitutional rights were not violated because he has failed to demonstrate that the jury would have learned any evidence of significant probative value or would have received a significantly different impression of B.M.'s credibility if the proposed line of cross-examination had been permitted.[12]

---

[12] In his briefing on this claim, Tapia cites to a request for judicial notice that he filed in this court, asking us to take notice of a May 5, 2025, printout of the Santa Clara County District Attorney's informational webpage on U visas. The content of that webpage is not part of the trial record, and Tapia has not made any showing that the webpage was accessible in the same form during or before his 2024 trial. Generally, information like that Tapia now offers may not be considered on appeal. (See *Glassman v. Safeco Ins. Co. of America* (2023) 90 Cal.App.5th 1281, 1306–1307; *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) Because Tapia has not presented any exceptional circumstances justifying a grant of judicial notice, we deny his request. (See *Vons*, at p. 444, fn. 3.)

26

3. Challenge to In Camera Inquiry Regarding B.M.'s Immigration Status

Tapia contends the trial court erred in conducting its inquiry into B.M.'s immigration status outside his and his counsel's presence. He asserts that Evidence Code section 351.4 neither requires nor permits a hearing without the parties present, he had a constitutional right to be present with counsel at this critical stage of his trial, and the error in conducting the inquiry without him was prejudicial because his and his counsel's presence "may have resulted in the admission of [B.M.]'s exculpatory testimony about U-visas."[13]

The Attorney General responds that Tapia forfeited his claim by failing to object to his exclusion from the trial court's inquiry, the statutory inquiry is "not considered a critical stage of criminal proceedings," the inquiry was properly conducted under Evidence Code section 351.4 outside the presence of the jury and the parties, and any error in excluding Tapia and his defense counsel was harmless.

"A criminal defendant has the right under the state and federal Constitutions to be personally present and represented by counsel at all critical stages of the trial. For purposes of the right to be present, a critical stage is 'one in which a defendant's " 'absence might frustrate the fairness of the proceedings' [citation], or 'whenever his [or her] presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' " ' [Citation.] As to the right to counsel, a critical stage is one 'in

---

[13] Tapia makes no argument challenging the trial court's failure to conduct its inquiry of B.M. on the record. We thus do not address whether any error occurred regarding that aspect of the inquiry. (See *People v. Mickey* (1991) 54 Cal.3d 612, 667 [failure to object at trial forfeits any claim of inadequate appellate record of juror excusals].)

which the substantial rights of a defendant are at stake' [citation], and 'the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 465 (*Bryant*); see also §§ 977, subd. (b)(1), 1043.)

"Proceedings held in chambers and outside the presence of a party are generally disfavored. [Citations.] However, the trial court retains discretion to conduct in camera ex parte proceedings to protect an overriding interest that favors confidentiality." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1299 (*Carasi*); see *People v. Valdez* (2012) 55 Cal.4th 82, 125 (*Valdez*) ["ex parte proceedings are permissible if 'compelling reasons justify them' "]; see also *Bryant, supra,* 60 Cal.4th at p. 466 ["[A]s to an assertion of the official information privilege, a trial court may properly conduct in camera proceedings to 'weigh the People's claim of privilege against defendant's asserted need for the information.' "]; *People v. Lawley* (2002) 27 Cal.4th 102, 159 [in camera hearing held under Evid. Code, §§ 1041, 1042, subd. (d),[14] regarding the nondisclosure of a confidential informant's identity]; *People v. Mooc* (2001) 26 Cal.4th 1216, 1226 [describing the trial court's examination of documents in chambers pursuant to a *Pitchess* motion under Evid. Code, §§ 915, subd. (b), 1045, subd (b)[15]]; *People v. Ayala* (2000) 24 Cal.4th 243,

---

[14] Evidence Code section 1042, subdivision (d) directs that if an authorized person refuses to answer a question on the ground the answer would tend to disclose the identity of the informant, "the prosecuting attorney may request that the court hold an in camera hearing. If such a request is made, the court shall hold such a hearing outside the presence of the defendant and his counsel."

[15] Evidence Code section 915, subdivision (b) provides in relevant part that "the court may require the person from whom disclosure is sought or the person authorized to claim the privilege, or both, to disclose the information in chambers out of the presence and hearing of all persons except the person

261–263 [noting ex parte proceedings may be appropriate regarding trial strategy or the review of information under the rule of *Brady v. Maryland* (1963) 373 U.S. 83].)

Tapia failed to object to the trial court's in camera inquiry with B.M., which apparently occurred outside the presence of any counsel. That failure forfeits his current claim of constitutional and statutory error. (See *Bryant*, *supra*, 60 Cal.4th at p. 465 [concluding that defendants' failure to object to the trial court's decision to conduct in camera ex parte proceedings concerning the application of the official information privilege forfeited a claim that their constitutional rights to presence and counsel were denied]; *Valdez*, *supra*, 55 Cal.4th at p. 123 ["Having received advance notice of the ex parte hearing, and having failed to object either before or after the hearing, defendant may not now claim that [the judge] prejudicially erred in holding an ex parte hearing."].)

Even if Tapia's current claim is not forfeited, we are not persuaded that any constitutional or statutory error occurred. Regarding Tapia's constitutional rights to be present and assisted by counsel, by enacting Evidence Code section 351.4, the Legislature has indicated its desire to protect persons involved in a criminal case against exposure of their immigration status. (See Stats. 2022, ch. 168, § 3 [stating that the legislation is urgent "[i]n order to immediately help protect undocumented residents of California and their ability to participate in the California justice system"].) Just as a trial court may exclude the defendant and defense counsel from proceedings related to the review of potentially privileged information, the identity of a confidential informant, trial strategy, or *Pitchess* material for

---

authorized to claim the privilege and any other persons as the person authorized to claim the privilege is willing to have present."

impeachment of a law enforcement officer, the trial court in the instant case had the discretion to override Tapia's right to be present and represented by counsel at the court's inquiry to protect B.M.'s immigration status. (See *Bryant*, *supra*, 60 Cal.4th at p. 466.)

Tapia argues that the term " 'in camera' " in Evidence Code section 351.4, subdivision (a) must "mean outside the presence of the jurors but with all counsel present." We agree that the phrase "in camera hearing" describes a nonpublic proceeding either in the judge's chambers or in a courtroom free of jurors and spectators, although not necessarily without counsel.[16] Nevertheless, we disagree with Tapia's contention that the procedure followed by the trial court in this case violated Evidence Code section 351.4.

Evidence Code section 351.4 itself is silent on the definition of "in camera," and a trial court generally possesses the authority to determine procedures related to evidentiary determinations.[17] Hence, we do not interpret the statute's directive regarding an "in camera hearing" to preclude the trial court from exercising its discretionary power "to conduct a proceeding in a defendant's absence 'to protect an overriding interest that favors confidentiality.' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1098.)

---

[16] Black's Law Dictionary defines "in camera" as "[i]n the judge's private chambers" or "[i]n the courtroom with all spectators excluded." (Black's Law Dict. (11th ed. 2019) p. 909, col. 2.) Likewise, "in camera proceeding" is defined as "[a] proceeding held in a judge's chambers or other private place." (*Id.*, at p. 1457, col. 2.)

[17] See *People v. Arredondo* (2019) 8 Cal.5th 694, 707 (courts may " ' "create new forms of procedures" in the gaps left unaddressed by statutes and the rules of court' "); *Jeld-Wen, Inc. v. Superior Court* (2007) 146 Cal.App.4th 536, 542 ("Trial courts have the inherent power to control the proceedings before them [citation] and to adopt suitable methods of practice [citation] to the extent its orders do not conflict with any statute and are not inconsistent with law."); see also Code Civ. Proc., § 187.

Nonetheless, because proceedings held "outside the presence of a party are generally disfavored" (*Carasi, supra*, 44 Cal.4th at p. 1299), a better practice would be to conduct the Evidence Code section 351.4 hearing in presence of the defendant and defense counsel.

Even assuming arguendo that the trial court violated Tapia's constitutional and statutory rights by conducting its inquiry of B.M. outside the presence of Tapia and his counsel, "where a court errs in proceeding ex parte, the error is not reversible per se." (*Valdez, supra*, 55 Cal.4th at p. 125.) "Such error . . . 'whether or not of federal constitutional dimension,' 'is not structural; it is an error in the conduct of the trial that requires us to consider the record.' " (*Ibid*. [finding the trial court's error in holding an ex parte section 1054.7 hearing harmless under both the state and federal prejudice standards].)

In the present case, B.M. told the trial court that she did not have a visa and "didn't even know what a U-visa was." We fail to see how B.M.'s status and ignorance of the existence of U visas would have changed if Tapia were present during the inquiry or if his counsel were able to ask questions regarding B.M.'s status and knowledge of a U visa's benefits. The record does not include any information undermining B.M.'s statements to the court, and Tapia offers only unfounded speculation about the possible outcome of further questioning by defense counsel. We thus conclude that any error in excluding Tapia and his counsel from the court's inquiry of B.M. was harmless beyond a reasonable doubt.

4. Challenge to Restriction of Tapia's Testimony

a. Additional Background Regarding Tapia's Testimony

During Tapia's direct testimony, he said that Sa. Doe had testified against him because "her sister is trying to" obtain a U visa. (See pt. I.B.2.,

*ante*.)  On cross-examination, Tapia similarly mentioned a U visa "for her sisters" as a reason why Sa. Doe would lie about him but acknowledged the lack of evidence regarding such a visa.  (See pt. I.B.2., *ante*.)

On redirect examination, Tapia stated that when the police told him of the abuse accusations, "It made [him] feel bad."  He added, "We were a family, and I wasn't expecting this to be done to me.  I was never expecting this, that [Ja. Doe and St. Doe] would do something like this.  Although [Sa. Doe] started talking to them.  Then they started saying these things."  Defense counsel next asked Tapia, "And why didn't you expect them to do anything like this to you?"  Tapia answered, "Because we were . . . fine.  We had never had any problems or anything.  We were okay.  *At some point a cousin of theirs got her visa, and then around that time [Sa. Doe] was already working for the county*."  (Italics added.)  The prosecutor objected saying, "lack of foundation at this point."  The trial court sustained the objection and struck Tapia's answer upon the prosecutor's request.  Defense counsel made no effort to establish a foundation or to assert grounds for admission of the stricken testimony.  Rather, counsel moved on to other topics.[18]

As detailed *ante* (see p. I.B.2.), Tapia later answered a juror question by reiterating his belief that the children were being manipulated because of "the U-visa that they want."  After further questioning by defense counsel, the trial court asked another juror question:  "How would [Sa. Doe] benefit to get a U-visa by this allegation?"  Tapia responded, "She's not seeking a benefit for herself but for her sisters" E.M. and B.M.  The prosecutor moved

_____

[18] Because Tapia frames his current claim of error as challenging the exclusion of his "testimony regarding U-visas" and only mentions specifically the information in the italicized portion of his answer, we do not consider the propriety of the trial court's ruling as to the unitalicized portion of Tapia's answer.

to strike that answer as lacking foundation and speculative. Following an off the record discussion with counsel for the parties, the court overruled the prosecutor's objection. Later, in response to another juror question, Tapia mentioned that at one point, E.M. had been "deported" and "the girls went to their grandmother at that time."

During further redirect examination, defense counsel questioned Tapia about why he felt afraid of being accused by St. Doe and Ja. Doe. Tapia testified that he "didn't feel safe, that they would think something bad about me and they did it anyway." Next counsel asked, "And you mentioned about a visa. Why do you think -- or how do you think they would get a visa?" Tapia answered, *Because a month before they filed the applications [sic], her mother -- their mothers told me.* (Italics added.) The prosecutor interrupted Tapia stating, "Objection." Tapia continued, " *'why don't you'* " (Italics added.) The prosecutor interrupted again saying, "Hearsay." The trial court sustained the objection. Defense counsel did not assert that Tapia's testimony should be admitted for a nonhearsay purpose or pursuant to a hearsay exception.

Thereafter, over the prosecutor's further objection under Evidence Code section 351.4, Tapia testified that before the accusations were leveled against him, he believed neither E.M. nor B.M. had a visa (to remain in the United States) and that they were trying to obtain visas. Tapia also testified (over the prosecutor's speculation objection) that he thought "they can get a visa based on the accusations."

  b. Analysis

Tapia contends the trial court abused its discretion and violated his constitutional rights by excluding the testimony italicized above about (1) B.M. and E.M. having "told him they were trying to get visas," (2) Sa. Doe

"working for the county," and (3) "a cousin of the complaining witnesses [having] had gotten a U-visa." He argues this testimony was relevant, probative, and admissible as nonhearsay evidence of his own state of mind, B.M.'s state of mind, and as circumstantial evidence of the complaining witnesses' state of mind.

We are not persuaded that any prejudicial error occurred. Regarding the excluded testimony about the unnamed cousin who had obtained a visa and Sa. Doe working for the county, Tapia makes no argument in his appellate briefing that the trial court erred in sustaining the prosecutor's objection on the stated ground of "lack of foundation." On that basis, we discern no abuse of discretion in the court's ruling.

A lack of foundation objection generally refers to the failure to show a preliminary fact. (See Evid. Code, §§ 400, 401.) "The court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury.'" (*People v. Lucas* (1995) 12 Cal.4th 415, 466 (*Lucas*).)

"Whether or not evidence tendered to affect the credibility of a witness is admissible depends on a preliminary ruling by the trial court that such evidence would be sufficient to sustain a finding that the witness' credibility is, indeed, affected thereby." (*Granville v. Parsons* (1968) 259 Cal.App.2d 298, 304.) Under Evidence Code section 403, subdivision (a)(4), the trial court must make a preliminary determination whether the foundational evidence is sufficiently substantial. (*Lucas*, *supra*, 12 Cal.4th at p. 466.) The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion. (*Ibid*.; see also *People v. Cortez* (2016) 63 Cal.4th 101, 124 [discussing consideration of a witness's personal knowledge].)

In the instant matter, prior to the exclusion of Tapia's testimony, there was no evidence presented (or proffered) about "a cousin" who had gotten "her visa." Tapia's assertion of visa acquisition was ambiguous as to the identity of the cousin, the type of visa allegedly obtained, and the timing of the alleged acquisition. Likewise, there was no evidence presented about Sa. Doe ever "working for the county." Rather, Sa. Doe had testified that she is a teacher who works "with students that have learning disabilities." She did not name her employer or provide any dates for her employment.[19]

Considering Tapia's answer in context, we conclude the trial court properly exercised its discretion in sustaining the prosecutor's lack of foundation objection. Before Tapia stated his answer, there was no foundational evidence substantiating his vague assertions about an unnamed cousin having ever acquired a visa of any kind or about Sa. Doe having worked "for the county" at the unspecified time of the alleged visa acquisition. We further decide that the trial court's exclusion of Tapia's answer did not violate his constitutional rights. (See *Blacksher*, *supra*, 52 Cal.4th at p. 821; *Cunningham*, *supra*, 25 Cal.4th at p. 999.)

Turning to the excluded testimony about B.M.'s and E.M.'s alleged statements to Tapia about getting visas, as a threshold matter, Tapia's assertions of a nonhearsay purpose and the application of a hearsay exception are forfeited by defense counsel's failure to raise those grounds in response to the prosecutor's hearsay objection. (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1178; *Pearson*, *supra*, 56 Cal.4th at p. 470, fn. 10; *People v. Livaditis* (1992) 2 Cal.4th 759, 778; Evid. Code, § 354, subd. (a) [a judgment may not be reversed for erroneous exclusion of evidence unless "[t]he

---

[19] St. Doe, *not Sa. Doe*, had testified that she was working as a CPS social worker in San Mateo County at the time of trial.

substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means"].)

Forfeiture notwithstanding, even if we assume the trial court erred in excluding the identified testimony, we decide that any error in sustaining the objection to Tapia's incomplete statement about what B.M. and E.M. told him was not prejudicial under any standard. As discussed *ante*, immediately after the court sustained the hearsay objection, defense counsel elicited Tapia's testimony on his beliefs that neither E.M. nor B.M. had a visa, they were trying to obtain visas, and they could get visas based on the accusations against Tapia.

Considering all the evidence presented at Tapia's trial, any admission of testimony about what B.M. and E.M. ostensibly told Tapia regarding visas would not have affected the jury's assessment of witness credibility or its verdicts. Under these circumstances, we decide that the assumed error in excluding Tapia's testimony was harmless under both the "reasonable probability" standard (*People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*) and the federal "beyond a reasonable doubt" standard (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)).

B. *Claims Regarding CSAAS Evidence and CALCRIM 1193*

    1. <u>Additional Background</u>

        a. Trial Court's In Limine Ruling

Before trial, the prosecutor moved to admit expert testimony on CSAAS, and Tapia moved to exclude it.

The trial court ruled that the prosecutor could present CSAAS evidence if "it's tailored to our trial," noting that CSAAS's "five factors have to meet what happened in this case" and if one factor was missing, then the

prosecutor "might want to take that out" because it would be irrelevant. The court added, if the CSAAS expert testimony is "overbroad and sort of a scatter gun approach, then that's not good." The court further warned the prosecutor against "any statistics coming from [the] CSAAS expert," because "[t]hey're supposed to be talking about dispelling myths," not "statistical analysis or predictability."

### b. Dr. Anderson's Testimony

Dr. Anderson testified that she had not reviewed any police reports about this case and did not know anything about the evidence and witnesses. Dr. Anderson additionally explained that she was testifying "based on the research and also some of [her] clinical personal experience working with kids who've been sexually abused."

Dr. Anderson discussed the background of CSAAS and described CSAAS as a convenient "model for helping us understand behaviors of kids who've been sexually abused and for [her] as a professional to help others understand behaviors we see among these children." Dr. Anderson explained that CSAAS "is not a mental health diagnosis, and it would be inappropriate to use CSAAS as a means of determining with a hundred percent accuracy whether or not a child was abused. That's simply not its purpose."

Dr. Anderson described, in detail, the five components of CSAAS: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction. Dr. Anderson explained that "not every child will experience or display behaviors consistent with all five of those categories," adding "CSAAS is not a check list of sorts." Dr. Anderson further noted that there is typically an "ongoing relationship" between the child and adult perpetrator, wherein the adult is "in a position of power over

37

the child" and "might be responsible for meeting some of the child's basic needs."

Dr. Anderson explained that "grooming is a process through which a perpetrator prepares the child and the environment for sexual abuse over a period of time." A child who eventually realizes that the perpetrator's behavior was inappropriate might feel responsible "because they didn't fight back or try to stop it" and might "fear that they will get in trouble because they did not do something or say something sooner."

On cross-examination, Dr. Anderson agreed that CSAAS is "not like a check list we can go through to try to solve a case" or "a diagnostic tool." She also acknowledged that false allegations of abuse "[c]ertainly" can occur, and CSAAS cannot be used to state whether a particular child has been abused. In addition, defense counsel asked Dr. Anderson questions regarding her knowledge of studies about children who had made false allegations, had false memories, or were susceptible to suggestion.

In response to a juror's question about the possibility of susceptibility to suggestion among children in the same household, Dr. Anderson said she was not aware of any research on that topic and referred to her earlier testimony saying, "generally speaking, . . the children who are more likely to be impacted by it are much younger. So by the time a child is, say, five years old, about kindergarten, the likelihood of them being suggestible drops off drastically." In response to a similar question on false memories, Dr, Anderson said although "anything is possible," "it's unlikely that this would happen." The trial court then cautioned the jurors regarding their questions "about how likely something is or is it possible." The court explained, inter alia, that it did not "want the jurors to take what's more likely or less likely

statistically into the jury deliberation room because that's not what this is about. It's not about what's more likely or less likely."

### c. Jury Instruction on CSAAS Evidence

In the final jury instructions, the trial court instructed the jurors with a modified version of CALCRIM 1193 as follows: "You have heard testimony from Tiffany Anderson regarding child sexual abuse accommodation syndrome. [¶] Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse. [¶] Tiffany Anderson's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not the alleged victims' conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."[20] Tapia did not object to this instruction.[21]

### 2. Challenge to Admission of Dr. Anderson's Testimony

Tapia contends the trial court abused its discretion and violated his right to due process in admitting Dr. Anderson's testimony on CSAAS. Tapia asserts that Dr. Anderson's testimony should have been excluded under

---

[20] The trial court modified the last sentence of the then-current version of CALCRIM 1193 to comport with the prior version of CALCRIM 1193. (See *People v. Page* (2025) 114 Cal.App.5th 1022, 1030 (*Page*) [explaining the 2022 amendments to CALCRIM 1193]; see also *id.* at p. 1032 [concluding that "the current version of CALCRIM No. 1193 (which uses the 'consistent with' phrasing), like the prior version (which used the 'not inconsistent with' phrasing), 'accurately instructs the jury on the limited use of CSAAS evidence' "].)

[21] Earlier in the trial, before Dr. Anderson testified, the trial court provided a similar instruction to the jury without any defense objection.

(1) Evidence Code section 801, subdivision (a), because it was not sufficiently beyond common experience to be of assistance to the jurors, (2) Evidence Code section 801, subdivision (b), because it was not generally accepted in the scientific community and "is subject to the *Kelly/Frye* test,"[22] and (3) Evidence Code section 352, because it was substantially more prejudicial than probative.

Expert witness testimony is admissible if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" (Evid. Code, § 801, subd. (a)), and is "[b]ased on matter (including [the expert witness's] special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the witness's] testimony relates." (*Id.*, subd. (b).) Under the *Kelly* rule, " 'when faced with a novel method of [scientific] proof, [the California Supreme Court] ha[s] required a preliminary showing of general acceptance of the new technique in the relevant scientific community' before the scientific evidence may be admitted at trial." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 831.) We review a trial court's decision to admit expert testimony under the Evidence Code for abuse of discretion. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*)*; People v. Lapenias* (2021) 67 Cal.App.5th 162, 170 (*Lapenias*).)

---

[22] Although Tapia refers to the rule as "*Kelly/Frye*," we follow the practice of the California Supreme Court and do not include the latter term when discussing the rule. (See *People v. Nieves* (2021) 11 Cal.5th 404, 442, fn. 8 ["Formerly known as the *Kelly-Frye* rule, based on the rulings of *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, the rule is now the *Kelly* rule in California after changes to the Federal Rules of Evidence that superseded *Frye*."].)

CSAAS evidence is routinely admitted in sexual abuse cases in California. "Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse. [Citation.] While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law [that] CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 171; see also *People v. Melgoza* (2025) 115 Cal.App.5th 632, 655–656 (*Melgoza*); *People v. Flores* (2024) 101 Cal.App.5th 438, 455–456 (*Flores*); *People v. Sedano* (2023) 88 Cal.App.5th 474, 479–480 (*Sedano*); *People v. Munch* (2020) 52 Cal.App.5th 464, 468–473 (*Munch*); *McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301; *In re S.C.* (2006) 138 Cal.App.4th 396, 418; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 (*Patino*); *People v. Harlan* (1990) 222 Cal.App.3d 439, 449–450; *People v. Stark* (1989) 213 Cal.App.3d 107, 116–117.)

Having considered the totality of Dr. Anderson's testimony in light of the precedent, we conclude the trial court did not abuse its discretion under Evidence Code section 352 or 801 when it admitted the CSAAS evidence. (See *Flores*, *supra*, 101 Cal.App.5th at pp. 458–459; *Lapenias*, *supra*, 67 Cal.App.5th at pp. 172–174; *Munch*, *supra*, 52 Cal.App.5th at pp. 472–473, 474–475.) We also conclude that the trial court did not err in admitting Dr. Anderson's testimony about CSAAS without subjecting it to analysis under *Kelly*. (See *Lapenias*, at p. 173; *Munch*, at pp. 472–473; *People v. Gray* (1986) 187 Cal.App.3d 213, 218–220.) Additionally, we are not persuaded by Tapia's contention that Dr. Anderson's testimony impermissibly "established that typical child sexual abusers and victims are exactly like [Tapia] and the complaining witnesses in this case." (See *Sedano*, *supra*, 88 Cal.App.5th at

41

p. 483 [rejecting defendant's argument that the expert's testimony "constituted 'affirmative profile evidence' "]; see also *Lapenias*, at p. 172.) We likewise are not persuaded that Dr. Anderson's testimony amounted to impermissible statistical probability testimony. (See *Page, supra*, 114 Cal.App.5th at pp. 1033–1034.)

Furthermore, we decide that Dr. Anderson's testimony about CSAAS did not violate Tapia's constitutional right to due process. (See *Melgoza, supra*, 115 Cal.App.5th at p. 656; *Lapenias, supra*, 67 Cal.App.5th at p. 174; *Patino, supra*, 26 Cal.App.4th at pp. 1746–1747.)

### 3. Challenge to Instruction with CALCRIM 1193

Tapia contends the trial court erred by instructing the jurors on CSAAS evidence using CALCRIM 1193. Focusing on the last sentence of the instruction, Tapia asserts that because "[t]he believability of the complaining witness's testimony is indistinguishable from the truth of the charge," the instruction "relieved the prosecution of its burden of proof, invaded the jury's province, and directed a verdict for the state."[23]

" 'We review a claim of instructional error de novo. [Citation.] The challenged instruction is considered "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." ' [Citation.] 'We of course presume "that jurors understand and follow the court's instructions." ' " (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 815–816 (*Ortiz*).)

---

[23] Notwithstanding Tapia's failure to object to the CALCRIM 1193 instruction and the Attorney General assertion of forfeiture, we address the merits of Tapia's claim because he contends the challenged instruction affected his substantial rights. (See *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604; *People v. Gomez* (2018) 6 Cal.5th 243, 312; § 1259.)

42

Tapia acknowledges that multiple California courts have rejected his contention that the language of CALCRIM 1193 impermissibly bolsters a complaining witness's testimony. (See *People v. Ramirez* (2023) 98 Cal.App.5th 175, 219–220 (*Ramirez*); *Ortiz, supra*, 96 Cal.App.5th at pp. 815–816; *Lapenias, supra*, 67 Cal.App.5th at pp. 175–176; *Munch, supra*, 52 Cal.App.5th at pp. 473–474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504 (*Gonzales*).) Nonetheless, Tapia contends that those cases were wrongly decided.

We are not persuaded that the existing precedent is wrong. Moreover, assessing the instant instruction in light of the entire record, we are not convinced that there is a reasonable likelihood the jurors applied the instruction in an impermissible manner. The instruction told the jurors that Dr. Anderson's testimony could not be considered as evidence that Tapia "committed any of the crimes charged against him." "Thus, the instruction explicitly precluded the use of that testimony to conclude inferentially from the victims' conduct and [Dr. Anderson]'s testimony that [Tapia] committed the charged . . . crimes. Moreover, the last sentence of the instruction did not compel a conclusion that the victims' conduct was consistent with being a sexual abuse victim." (*Ortiz, supra*, 96 Cal.App.5th at p. 816.) Additionally, Dr. Anderson testified that CSAAS is not a "check list" or "diagnostic tool." In the same vein, the prosecutor reiterated in closing argument that CSAAS "is not evidence designed to tell [the jurors] that this abuse occurred."

Under the present circumstances, we conclude the trial court properly instructed the jury with CALCRIM 1193, and Tapia's constitutional rights were not violated by that instruction. (See *Ramirez, supra*, 98 Cal.App.5th at pp. 219–220; *Ortiz, supra*, 96 Cal.App.5th at p. 816; *Lapenias, supra*, 67

Cal.App.5th at p. 175; *Munch, supra,* 52 Cal.App.5th at p. 474; *Gonzales, supra,* 16 Cal.App.5th at p. 504.)

C. *Alleged Prosecutorial Misconduct in Cross-examining Tapia and Closing Argument*

Tapia contends the prosecutor committed prejudicial misconduct and violated Tapia's constitutional rights by (1) "misleading the jurors about the absence of the erroneously excluded evidence" regarding U visas; (2) appealing "to the jurors' emotions and sympathy for the complaining witnesses by repeatedly asking [Tapia] whether they were lying and then repeatedly arguing that his responses were 'offensive' " (underscoring omitted); and (3) implying "defense counsel presented a dishonest defense, suborned perjury, and believed that [Tapia] was guilty" (underscoring omitted).

### 1. <u>Legal Principles</u>

" 'Prosecutorial misconduct requires reversal when it "so infect[s] a trial with unfairness [as to] create a denial of due process. [Citations.] Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury." ' " (*People v. Peterson* (2020) 10 Cal.5th 409, 464 (*Peterson*).)

" 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1337.) "[A]n appellate court reviews a trial court's ruling on

44

prosecutorial misconduct for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 213; *People v. Peoples* (2016) 62 Cal.4th 718, 792–793 (*Peoples*).)

Prosecutorial misconduct that amounts to federal constitutional error is harmless if "we conclude that the prosecutor's comments and questioning were harmless beyond a reasonable doubt." (*People v. Cook* (2006) 39 Cal.4th 566, 608, citing *Chapman, supra,* 386 U.S. at p. 24.) Prosecutorial misconduct that violates state law will not result in a reversal of the judgment unless it is reasonably probable that the jury would have reached a result more favorable to the defendant in the absence of the error. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1071; see also *Watson, supra,* 46 Cal.2d at p. 836.)

2. <u>Analysis</u>

Tapia asserts that the prosecutor committed misconduct when she argued to the jurors that a " 'new conspiracy theory' " came out during Tapia's testimony, but the jurors " 'heard no evidence about a visa' " and "[n]one of the witnesses were even cross-examined about whether they were aware of any sort of" visa. Defense counsel objected to this remark as "[i]mproper argument," and the trial court overruled that objection. The prosecutor next reiterated that the witnesses had not been cross-examined about the existence of any visas adding, "They didn't talk about it. There's no evidence of that. [¶] . . . There's no evidence that any such visa actually existed."

Tapia's current claim of error fails because it rests on a nonexistent condition precedent—namely that the prosecutor's remarks exploited a prior erroneous evidentiary ruling regarding the proposed cross-examination of B.M. about U visas. As discussed *ante* (pt. II.A.2.), we conclude there was no error in the restriction of Tapia's cross-examination of B.M. Because there

45

was no evidentiary error and the prosecutor's argument was a fair comment on the evidence presented at trial, there was no misconduct in the prosecutor's argument. (See *Peterson*, *supra*, 10 Cal.5th at pp. 465–466.)

Tapia further contends the prosecutor improperly questioned him about "whether the complaining witnesses were lying about various points." Tapia specifically references the prosecutor's cross-examination questions about (1) prosecution witnesses having lied when they said that Tapia drank "a lot," (2) Sa. Doe having lied about the abuse because of the dog incident, (3) A. Doe having "made up" the pool incident because she was "[m]anipulated" by Sa. Doe, (4) St. Doe having provided emotional testimony "based on a lie that she's telling now," (5) Ja. Doe having provided testimony that was a lie because "[s]he's being manipulated" by Sa. Doe, who led "one big conspiracy against" Tapia, and (6) all the complaining witnesses having lied because of the dog incident and U visas.

We disagree with Tapia that the referenced questioning amounted to misconduct. " 'Where a defendant takes the stand and makes a general denial of the crime [with which he is charged,] the permissible scope of cross-examination is very wide.' [Citation.] When a defendant voluntarily testifies in his own defense the People may 'fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.' " (*People v. Harris* (1981) 28 Cal.3d 935, 953.)

In the instant matter, the prosecutor legitimately inquired into Tapia's direct testimony and prior statements about the purported bias of the prosecution's witnesses and their motives for leveling false accusations against him. As our Supreme Court has explained, cross-examination of a

defendant about the reasons provided for witness deception "should not be categorically prohibited" (*People v. Chatman* (2006) 38 Cal.4th 344, 382), and when the defendant "knows the witnesses well, . . . questions regarding any basis for bias on the part of a key witness are clearly proper." (*Id.* at p. 383.) Considering the challenged questioning in context, we cannot conclude that the prosecutor's inquiry into Tapia's stated beliefs regarding the witnesses' motives to lie was either argumentative or designed to elicit irrelevant or speculative testimony. Hence, there was no prosecutorial misconduct. (See *ibid.*; see also *People v. Hill* (1998) 17 Cal.4th 800, 819.)

Relatedly, Tapia asserts that "the prosecutor compounded the misconduct when she used [Tapia]'s responses to her improper questions to attack his credibility in her closing argument" and "repeatedly argued that it was 'offensive' for [Tapia] to suggest that the complaining witnesses were lying." Tapia specifically references three instances of alleged improper argument by the prosecutor: (1) "Are we to believe that [St. Doe] has dedicated her life and career to some sort of conspiracy or lie? Again, that is an offensive suggestion from the defendant. She took her pain and she made it something productive. That's real."[24] (2) "Now I'd like to talk to you about different lies that you'll find throughout the evidence in this case that the defendant told because the defendant testified, and, frankly, his testimony was offensive." (3) "And I just want to remind you again these people are from different families. This is not one group of girls that all lives together, all influencing each other. They all lived separately when these allegations

---

[24] Although Tapia did not object to this remark at trial, the Attorney General does not assert forfeiture on appeal. We thus will address the merits of Tapia's challenge to this remark.

came to light.  And you saw real, raw pain.  It is offensive to suggest otherwise."[25]

Tapia claims the three referenced remarks "improperly appealed to the jurors' emotions and sympathy for the complaining witnesses," "improperly cast aspersions on [Tapia]'s fundamental constitutional rights to testify and to present evidence in his own defense," "improperly vouched for the credibility of the complaining witnesses, using the prestige of [the prosecutor's] office to protect them from scrutiny," and intimidated the jurors on the question of the complaining witnesses' veracity.

We discern no misconduct in the prosecutor's arguments.  "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial.  [Citation.]  Whether the inferences the prosecutor draws are reasonable is for the jury to decide.  [Citation.]  Harsh and vivid attacks on the credibility of opposing witnesses are permitted, and counsel can argue from the evidence that a witness's testimony is unsound, unbelievable, or even a patent lie." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)  "Using colorful or hyperbolic language" (e.g., " 'ludicrous,' 'ridiculous,' 'preposterous,' 'outrageous,' 'offensive,' 'shock[ing]' or 'bull' ") to characterize defense testimony or argument "will not generally establish prosecutorial misconduct." (*Peoples*, *supra*, 62 Cal.4th at p. 793.)

We agree with Tapia that the prosecutor's characterization of Tapia's contentions as "offensive" is problematic.  However, we conclude Tapia has failed to show a reasonable likelihood that the jury applied the complained-of comments in an improper manner.  The prosecutor's remarks amount to fair

---

[25] Regarding the last two remarks, in response to defense objections for "[i]mproper argument," the trial court told the jurors "what the attorneys say is not evidence."

comment on the trial evidence (see *Peoples*, *supra*, 62 Cal.4th at p. 793; *People v. Medina* (1995) 11 Cal.4th 694, 759) and were not improper vouching, because the prosecutor did not suggest that unpresented evidence supported the arguments or invoke the prosecutor's personal prestige or depth of experience, or the prestige or reputation of the district attorney's office, in support of the arguments. (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.)

Tapia lastly claims that, in rebuttal argument, the prosecutor "improperly implied that defense counsel was obligated or permitted to present a dishonest defense," "did present false testimony – [Tapia]'s testimony – and that counsel believed that [Tapia] was guilty." Tapia references the following remarks (made over a defense objection) as support for his claim: " '[Defense counsel] is a good attorney. He's a nice guy. He has to get up here.' " " 'He has to say something to you. That doesn't mean that what he's saying is reasonable.' "

" 'A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel.' [Citations.] 'In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks' [citation], and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Edwards* (2013) 57 Cal.4th 658, 738; see also *People v. Herring* (1993) 20 Cal.App.4th 1066, 1075.)

We generally agree with Tapia that the prosecutor should not have suggested defense counsel failed to believe the defense evidence and had no choice but to "say something." However, the prosecutor's problematic remarks were fleeting and do not require a reversal of Tapia's convictions. Considering the prosecutor's remarks in the context of her broader argument

highlighting inconsistencies in the defense, contrasting the defense case with the prosecution's evidence supporting the victims' credibility, and noting that defense counsel "didn't really touch on the conspiracy theories that were outlined by" Tapia, suggested "this was maybe more of a false memory situation," and said Tapia "told [the jurors] the truth when he was testifying," we conclude that Tapia fails to show a reasonable likelihood the jurors would have construed the problematic remarks in an objectionable manner. (See *People v. Charles* (2015) 61 Cal.4th 308, 328–329.)

D. *Alleged Intrusion into the Jury's Deliberation*

Tapia contends that trial court prejudicially intruded into the deadlocked jury's deliberation in violation of sections 1140 and 1089 and Tapia's constitutional rights. To put these arguments in context, we set out in some detail the court's interaction with the deliberating jury.

1. Additional Background on Jury Deliberation

The jury deliberated the case over five days: May 1, 2, 6, 7, and 8, 2024.[26]

a. May 1

The deliberation began in the late morning on May 1. That afternoon, the jury requested additional copies of Tapia's police interview and the pretext call. The jury deliberated until 4:00 p.m.

b. May 2

On the morning of May 2, the jury sent out a note (jury note No. 2) asking, "Why did we not hear from [E.M.] and/or the grandmother? They did not testify!!" (Capitalization omitted.) After consulting with counsel for the parties, the trial court responded by telling the jurors to "[p]lease read"

---

[26] Unless otherwise indicated, all dates were in 2024.

50

CALCRIM Nos. 220 (regarding reasonable doubt) and 300.[27]  That afternoon, the jury asked to take the next day off (a Friday), because two jurors had schedule conflicts.  The jury also asked to resume deliberation on Monday (May 6) at 1:00 p.m. because of another schedule conflict.  The jury concluded its deliberation for the day shortly after 4:00 p.m.

### c.  May 6

On May 6, the jury resumed deliberation at 1:30 p.m.  At 1:32 p.m., the jury sent out jury note No. 4 stating:  "We seem to be not able to make a decision.  The part we are hung up on (basically [juror No.] 3) is unable to come to a decision based on the testimony of a single witness for the charges."[28]

Thirty minutes later, juror No. 3 sent out a note (jury note No. 5) asking, "Will/[c]an this go to retrail [*sic*] if a decision is not made?"

The trial court consulted counsel for the parties about the jury's notes.  The court responded in writing to jury note No. 5 saying, "That is a future decision to be made.  The decision should not affect your deliberations."  In addition, the court convened the parties and the jury in open court and provided additional instruction (based on *People v. Moore* (2002) 96 Cal.App.4th 1105 (*Moore*)) to assist the jurors in their further deliberations.  The court told the jurors, inter alia, that (1) in the court's experience, more than once, a jury that "initially reported it was unable to reach a verdict, was ultimately able to arrive at a verdict," (2) the jurors' goal should be to reach a

---

[27] The CALCRIM No. 300 instruction provided to the jury read: "Neither side is required to call all witnesses who may have information about the case or to produce all physical evidence that might be relevant."

[28] The jury instructions included CALCRIM No. 301 (titled, single witness's testimony) and CALCRIM No. 1190 (titled, other evidence not required to support testimony in sex offense case).

fair and impartial verdict "if you are able to do so based solely on the evidence presented without regard for the consequence of your verdict or regardless of how long it takes to do so," (3) the jurors' duty is to carefully consider, weigh and evaluate all the evidence, discuss views on the evidence, and listen to and consider the views of fellow jurors, (4) during further deliberations, the jurors "should not hesitate to reexamine your own views or to request your fellow jurors to reexamine theirs" and "should not hesitate to change a view once you held [*sic*] if you are convinced it is wrong or to suggest other jurors change their views if you are convinced they are wrong," (5) each juror must decide the case for themselves and should do so only after a full and complete consideration of all the evidence with fellow jurors, (6) the jurors' duty is "to deliberate with the goal of arriving at a verdict on the charges if you can do so without violence to your individual judgment," (7) the parties "are entitled to the individual judgment of each juror," (8) the jurors have "absolute discretion to conduct your deliberations in any way you deem appropriate," (9) the court suggests the jurors consider changing their methods of deliberation "at least temporarily and try new methods" (for example, "you maybe wish to consider having different jurors lead this discussion for a period of time or wish to experiment with reverse role-playing by having those on one side of an issue present an argument of the other's position and vice versa"), (10) the court is "not dictating or instructing you as to how to conduct your deliberations," rather it is "simply stating that you may find it to be productive to do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors," and (11) the court, as needed, can provide "further explanation of a legal term, allow the attorneys to give another small closing argument on the topic which is of interest to the jurors,

possible readback of certain sections of testimony, or anything that [the jurors] think might help [them]."

When the trial court orally asked if the jurors had any questions about the process for further deliberation, juror No. 3 responded: "Well, based on why we're having this discussion, I guess the only question I had is because I had no idea of what was going to be involved. But upon hearing the testimony from the detective, I didn't get an opportunity to ask my question. And I wanted to ask the question, and the question that I wanted to ask is were all individuals involved questioned. And by involved, I mean those that either saw or heard something."[29] The court orally replied to juror No. 3 that he had provided "helpful information" and the court needed to talk with the attorneys before providing an answer to his comment. The court further recommended that the jurors continue deliberation and send out any additional questions or comments they might have.

Next, juror No. 6 commented as follows: "So sort of like a broader point that's come up is the question of how would we handle a lack of something being presented to us. So sort of like we have this body of knowledge." Juror No. 6 continued: "And there's a world of information outside of that we were never told. So, ergo, that's outside our deliberative process. There's been some question about how we should weigh, well, this -- we didn't hear about this thing here and, therefore -- and then, you know, some people take that into account, how do we deal with this."

The trial court responded by explaining that it could not tell the jurors "how to deliberate or how to get around that," but it could bring them "back

---

[29] At the conclusion of Detective Vera's trial testimony, the trial court asked if any juror had a question for the detective. There is no indication in the record that juror No. 3 demonstrated a desire to ask Detective Vera a question.

to the law and hope that that helps." The court added, "And I want to be clear that I don't want a verdict to be pushed one way or the other because of what I have to share with you. I want you to either come back with verdicts for guilty or verdicts of not guilty, and even saying 'We can't decide' is a legitimate response from a set of jurors. [¶] However, as I said at the beginning of the trial and as you got an instruction maybe once or twice that says neither party is required to bring in all witnesses who may have any information about this trial."

The trial court orally described for the jury some possible reasons for a witness's unavailability or refusal to participate and a party's decision not to subpoena certain witnesses. The court explained, "But if we have a trial with everybody who is brought in, that saw everything and knew everything about this family, this trial would be probably two months long, and so there has to be some natural and appropriate paring by both the [district attorney] and the defense attorney. [¶] And I want to be clear, though. Even with that very natural process, it could mean that the case has not been proved beyond a reasonable doubt because maybe the elements have not been met. . . . [W]hat you are experiencing is not drastically unusual. What you experience is very normal. We don't have every witness come to every trial, and jurors sometimes have an issue with that and send out a note, and this is what we tell them."

The trial court continued, "But believe me, if that rises to the level of not beyond a reasonable doubt, then it's not beyond a reasonable doubt; okay? Everybody have that?" The court next asked the jurors to continue deliberating and said, "in case you're wondering if you are still dead locked, we'll probably have you keep going again because of the nature of this case and the cost to the community. But, nonetheless, you take as long as you

54

want. And if it is we can't decide, that is a fair response from our jury; okay? So thank you."

Thereafter, off the record and outside the presence of the jury, the trial court and counsel for the parties discussed juror No. 3's question about whether all individuals involved were questioned by the police. Back on the record but outside the presence of the jury, the court stated that both counsel did not want the court to specifically address juror No. 3's question. Defense counsel noted that he was "not opposed to telling [juror No. 3] not to consider any other evidence" and added, "I don't think we should tell them an answer [to the question] one way or the other." The prosecutor noted that she had earlier expressed an interest in having the court conduct "an inquiry into jury misconduct" and added that if the jury remained deadlocked, "that would be an appropriate next step." The court recounted that after it had received the jury's notes, it informed counsel of its intent to provide additional instruction under *Moore* and direct the jurors to continue deliberating.[30] The court also recounted that it had responded to the prosecutor's suggestion for a jury inquiry by explaining that such an inquiry is in the court's " 'mind of tools we have available to us. But as a [c]ourt, I take the least intrusive step first because we may not have to pierce the deliberative process.' " The court continued, "It's pretty obvious that juror [No.] 3 is the holdout against 11,

---

[30] There is no indication in the record that Tapia's defense counsel objected to any of the trial court's additional instructions or its order of further deliberation. Nevertheless, the Attorney General does not argue that Tapia forfeited his appellate claim that the court's instructions were coercive. Given the Attorney General's failure to assert forfeiture, we consider the merits of Tapia's current claim. (See *People v. Butler* (2009) 46 Cal.4th 847, 882, fn. 18 (*Butler*) [considering defendant's unpreserved appellate claims "only to determine whether the instructions affected his substantial rights" and noting "that defense counsel's failure to object tends to indicate[] that the potential for coercion argued now was not apparent to one on the spot"].)

and it's pretty obvious that all of the other jurors are indicating through their body language that's a very discrete issue that has to be overcome, that issue being one juror's interpretation of one instruction, apparently."

Later, at 3:59 p.m. on May 6, the jury sent out another note (jury note No. 6) stating: "After more deliberations, we believe there is one juror (#3) who is unable to make a decision based on the single witness testimony. [¶] We plan to continue deliberations tomorrow." At the same time, juror No. 3 sent out jury note No. 7 stating: "Was it ~~decided~~ said a retrial will not bring on more witnesses? Possibly could [E.M.] and/or the grandma ~~be suppon~~ testify in a future trial?" (Capitalization omitted.) Upon sending out these two notes, the jury concluded its deliberation for the day.

### d. May 7

On the morning of May 7, the trial court and counsel for the parties discussed the latest jury notes. The court said it had "some issues" with juror No. 3's note "because we just got done telling him and the jurors, after the first time he wrote out a note asking is there going to be a retrial, don't think about the retrial, don't consider it for any reason. That's a decision that's going to be made in the future, if at all, and it's not part of your deliberations. [¶] And then [juror No. 3] apparently doesn't either understand what that means or chooses not to follow that, because he's fixated on this and wrote back" with a question about a retrial, "[w]hich is also not something we ever said."

In addition, the trial court detailed "some other problems" regarding juror No. 3, including that he had shown up "a lot late" to court "on more than one occasion" and once "kind of came running into the courtroom and jumped into his seat, said a few things, and then said, 'fuck' out loud as [the prosecutor] began her examination of" a witness. The court added that juror

56

No. 3's profanity "wasn't a small exclamation. It was a very loud exclamation." The court acknowledged that other jurors had arrived late for court but characterized juror No. 3's conduct as "sort of strange." The court further noted that juror No. 3 had tried to ask a question of a witness out loud despite having been instructed that juror questions should be written down on a provided form. The court explained, "over a pattern of watching [juror No. 3], I have some concerns about [] either his ability to follow instructions and the ability to follow [c]ourt orders and the possibility that he may be not completely sober when he's with us because it has been odd behavior."

Defense counsel responded by noting that two other jurors had "attempted to ask questions" or "at least gestured or waved their arms when other jurors were making questions." Counsel further stated his belief that juror No. 3 "is obviously engaged in the trial," did not act inappropriately (as far as counsel had seen), and "was focused."

The trial court responded by further noting that during trial, juror No. 3 submitted a question for Dr. Anderson (which was not asked upon stipulation of counsel) that said, " 'Were you a victim of sexual abuse,' " which the court described as "unusual and inappropriate."

The trial court summed up the discussion with counsel saying, "So the reason why I bring all this up now is not to say that these things in isolation amount to much. But the [c]ourt has to make a decision about whether I'm going to make an inquiry. And I believe that there's enough before me to make an inquiry based upon this – [j]uror [No.] 3's conduct up to this point. [¶] So I am going to talk to the foreperson and find out -- at least from his perspective, what's going on. It'll help us with our decisions. But it won't go into the deliberating process."

Defense counsel objected to the proposed inquiry, stating that "calling out the foreperson or calling out any juror is likely to taint the juror into thinking that what they are doing is incorrect." Counsel continued, "I think this all stems from the one witness rule, which . . . is a permissive instruction, not a mandatory instruction." Counsel added that the jurors "have not indicated that they're deadlocked. I think [juror No. 3] is not refusing to deliberate. I don't think there's any issue that warrants interfering with the jury process at this time. [¶] I think, if anything, we're going to be tainting the jury into thinking that they are incorrectly looking at the one witness rule. I think it implies to them that they should accept, based on this one witness, and not consider[] that other evidence may be out there or could be out there."

The prosecutor responded by highlighting that there were multiple concerns about juror No. 3 not following the court's instructions, not only "this issue of single-witness testimony."

The trial court summoned and questioned the jury's foreperson on the record for a total of approximately eight minutes. The court began its inquiry of the foreperson by saying that it had some questions based on the jury's notes. The court also said, "I want to make sure that you understand that I don't want to know about the deliberative process" or "what people are saying." The court continued, "[b]ut I kind of want to know, because I need to know, do we have a problem where somebody's not following the [c]ourt rules and instructions, or do we have a situation where it's just people have a difference of opinion about what is beyond a reasonable doubt?" The foreperson responded, "I think it's the latter. More the latter." The foreperson added, "So I think one juror is hung up in -- the juror is looking for corroborative evidence." The foreperson explained that "the source of the

58

difficulty . . . is that A said something to B. So the B, we have not heard from B as a witness or corroborative evidence. So how can we, you know, rely on this A?" The foreperson added that "one" juror "needs or seems to want that information to make the decision."

The foreperson confirmed his awareness of the notes that juror No. 3 had sent out. The trial court asked the foreperson why juror No. 3 had re-asked a question about a possible retrial after the court instructed the juror not to " 'think about that.' " The foreperson responded, "I think that juror is unable to cross the bridge. He's unable to go past that thought." After the court noted its prior written response to jury note No. 5 (instructing that a retrial " 'is a future decision' " that " 'should not affect your deliberation' "), the foreperson responded "Yes" to the court's questions about whether all the other jurors were "in line" with that instruction and juror No. 3 was "the only one that has a problem with this."

After speaking with counsel at sidebar, the trial court directed the foreperson to return to the deliberation room.

Next, the trial court decided "that there's enough, based upon what the foreperson said, to make inquiry of the target juror" (i.e., juror No. 3). Defense counsel objected to the inquiry, asserting that the foreperson confirmed juror No. 3 "is deliberating."

The trial court questioned juror No. 3 on the record for approximately eight minutes. The court began by assuring juror No. 3 that he was "not in trouble." The court explained that it "just want[ed] to have a chat to find out what's going on and see if we can help you, or if there's a misunderstanding or not." The court added that it did not "want to talk about the deliberative process" or "what people are saying back in the jury deliberation room," but rather it "just want[ed] to talk about topics."

The trial court asked if juror No. 3 was "concerned with or thinking about or deliberating about the fact that two of the people who didn't testify in this trial and you think that if they testified in a future trial, that would satisfy you?" Juror No. 3 responded, "What I said in the deliberation room is, 'Don't you want to hear from everyone that was involved in the case because we can make a decision based on this -- these facts?' I go, 'There are people here with some critical information that we're not hearing from. Why?' [¶] And I said -- I go -- so the question I had is were grandma and mom there when they got together at Burger King? Were the parent and the mom still living at the residence when this all got brought out? So if so, then obviously, I'm thinking they were either questioned or if they weren't, why weren't they questioned?"

After speaking with counsel for the parties at sidebar, the trial court asked juror No. 3 why he had sent a second note asking about retrial when the court "already instructed with a direct [c]ourt order don't consider whether there's going to be a retrial or not." Juror No. 3 responded, "I think it -- what I was trying to go through my head -- because I'm trying to -- because I'm not -- I'm having to resolve what they're telling me in the deliberation room and what I remember hearing in here. And that's all I was trying to get at. [¶] Because the questions that I was asking from them, they . . . we weren't in agreement as to what we're in here. So that's why I brought out the second question. I go, 'So did I hear that there will not be a retrial?' [¶] I was just trying to get the information. I was just trying to get the information as to whether or not there will not be a retrial and we have to make a decision here, or -- you know, and this is all I was telling them -- I says [sic], 'Wouldn't you want to get all the facts out there to the people so that they could make a better decision on this? And if there was a retrial and

those witnesses were brought on and we got that information, would that not be helpful?' [¶] That's all I was asking. I go, 'Would more information be helpful?' Because right now at this point now it's just hearsay for me. Now I have to believe something, whether it happened. [¶] 'Cause now it's -- there were people there that heard something that could have confirmed it happened, and yet I'm not getting that fact. That's all."

The trial court next addressed the one witness rule. The court asked if juror No. 3 accepted "that the testimony of one witness could support a conviction on that count?" Juror No. 3 said, "If that witness came in with factual evidence, no, I don't need more than one witness. But if it's hearsay, 'Well, I said this. And this is what happened,' and no one is confirming it and it's a him against her, that's a tough one to me. [¶] I mean, I -- I could try to discern and try to make some type of -- but there's going to be a one percent -- a couple of percentages of me, then, saying, [w]ell, there could be doubt that -- did that really happen? 'Cause there's no fact to -- to what is being said. [¶] All I'm saying is is there factual evidence that I'm hearing or just someone saying this happened?" The court next asked, "Do you accept that words from one woman is evidence?" Juror No. 3 answered, "I could -- as evidence, yes. It could be evidence. But is it fact?" Juror No. 3 further confirmed that he understood a woman's trial testimony is not hearsay.

When the trial court asked if juror No. 3 accepted that a conviction "could rest on the testimony of that single witness without grandma" or E.M., juror No. 3 said yes and added, "The only reason is because I know that they were a part of it. And now having this in the case where, unfortunately, this is the only witness. So that's the only person we're going to hear from. I don't need to hear from anybody; I need to make this decision based on what I'm hearing. Yes. But knowing there's other people involved, that, to me, I

get to the point is wait a minute. There's more information here. [¶] You know? And then, so I guess what I'm trying to resolve at that point is had it been only the one person to be able to give any evidence out, fine. I'll make that -- we will have to make that decision. But unfortunately that's not the case here. There's people -- other people that were involved that we're just not hearing from. So that just leaves a bubble." The court replied, "Understood."

After speaking with counsel at sidebar, the trial court instructed juror No. 3 to continue deliberating. The court also instructed juror No. 3, "Do not consider any future consequences of your verdicts or nonverdicts. Do not discuss that in your deliberations. Do not consider whether there will be a retrial after your deliberations. Don't make that part of your deliberations. Don't think about who might testify in a future trial. Just think about who testified in this trial." The court continued, "And if you believe that the evidence is beyond a reasonable doubt, that you would say guilty; if you believe the evidence is not beyond a reasonable doubt, you would vote not guilty." Juror No. 3 responded, "Understood." The court added, "And then don't discuss what we said out here with the other jurors. I just want to check in with you, but I'm going to put you back in there. You guys can start where you left off."

Juror No. 3 next asked to say something more about "why this is -- come about [*sic*]?" He explained: "Well, it -- the children, when bringing it up to the adults, weren't believed; that's unfortunate, if this happened. [¶] Is it still that? Is it still that the adults do not believe -- I didn't see any supporting people here with the people that were testifying that this happened, or were there? If there were, I had no evidence of it. [¶] Were mom and grandma here supporting their children that this happened?" The

62

trial court responded, "I see. Okay. So I'm going to have you continue your deliberations. And if you need anything else, just let us know." Juror No. 3 replied, "Okay."

After juror No. 3 exited the courtroom, the trial court recounted that when speaking with counsel at sidebar during the inquiry, they "all agreed that [juror No. 3] was deliberating and that he just feels that the evidence does not prove the case beyond a reasonable doubt. [¶] And that is a perfectly acceptable position to have, given the evidence in this case. And his view of the world. [¶] And so we're going to let him keep deliberating."

Later in the morning of May 7, the jury sent out a note requesting a readback of A. Doe's and Ja. Doe's trial testimony regarding the pool incident and another note requesting A. Doe's preliminary hearing testimony. The jurors received a readback of the requested trial testimony that afternoon. Regarding A. Doe's preliminary hearing testimony, the trial court informed the jurors that they "may only consider evidence that is part of the trial record."

At 3:44 p.m. on May 7, the jury sent out jury note No. 10 stating: "We are deadlocked because we have a juror (#3) who can't make a decision because, although they believe the testimony, without other people's testimony they can't decide." Upon sending out this jury note, the jury concluded its deliberation for the day.

e. May 8

The jury resumed its deliberation on the morning of May 8. Thereafter, the trial court convened all the jurors in open court and asked the foreperson whether the statement in jury note No. 10 was accurate. The foreperson responded that it was as of the prior afternoon, but the jurors had "started the day off maybe on a positive note" and they "might be making progress."

63

The court noted that other jurors were "shaking their head yes" regarding the potential benefit of further deliberation.

The trial court reminded the jurors that "a not guilty verdict is an acceptable verdict. A guilty verdict is an acceptable verdict, and we can't decide is an acceptable result. [¶] I don't want to pressure anybody. I want you to work through this and, as a group, come to a verdict if you can." In response to a question from the foreperson, the court added that the jurors could come to different verdicts among the counts. The court further noted that additional closing argument would be possible if the jurors thought that might help them.

Juror No. 3 asked the trial court to provide additional jury note forms because he was "going to request more information" and thought the jurors were "going to need it to make this decision." The court said "Sure" and added that "the way it works is you work as a group to fill out those forms" "[a]nd that way we get a better question at the end. Like you narrow it down to what you really need, but send out as many forms as you need to help you."

The jury continued deliberating and sent out a note later that morning asking whether they should leave a verdict form blank if they are undecided on a particular count. The trial court in writing responded affirmatively.

Shortly thereafter, the jury informed the bailiff that it had reached verdicts. As detailed *ante* (pt. I.A.), the jury found Tapia guilty on 30 counts and did not return a verdict on two counts (which concerned Ja. Doe and A. Doe). Each juror confirmed the verdicts when polled by the trial court.

2. Legal Principles

"Section 1140 provides in relevant part that a 'jury cannot be discharged' without having rendered a verdict unless, 'at the expiration of such time as the court may deem proper, it satisfactorily appears that there

is no reasonable probability that the jury can agree.' 'The decision whether to declare a hung jury or to order further deliberations rests in the trial court's sound discretion.' [Citations.] However, a court must exercise its power under section 1140 without coercing the jury, and 'avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." ' [Citation.] . . . '[A]ny claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 88 (*Brooks*); see also Cal. Rules of Court, rule 2.1036 [suggesting measures for assisting a jury at an impasse, including further instructions].) A trial court's decision about whether and how to employ tools for assisting a jury at an impasse are reviewed for abuse of discretion. (See *People v. Thomas* (2023) 14 Cal.5th 327, 402 (*Thomas*); *People v. Debose* (2014) 59 Cal.4th 177, 209; *People v. Salazar* (2014) 227 Cal.App.4th 1078, 1088.)

"Whether a trial court has improperly coerced a jury is a separate, albeit related inquiry from whether the court abused its discretion under section 1140. A court must exercise its power without coercion of the jury so as to avoid displacing the jury's independent judgment ' "in favor of considerations of compromise and expediency." ' [Citations.] Whether coercion occurred depends on the facts and circumstances of each case. [Citation.] Coercion involves ' "a judicial attempt to inject illegitimate considerations into the jury debates [and] . . . appeal to dissenting jurors to abandon their own independent judgment of the case against the accused," ' by exerting ' "excessive pressure on the dissenting jurors to acquiesce in a verdict." ' " (*Thomas, supra,* 14 Cal.5th at p. 403.)

" ' "Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of

considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived ' "as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered." ' " ' " (*Peoples*, *supra*, 62 Cal.4th at p. 783; see also *Valdez*, *supra*, 55 Cal.4th at p. 162 [noting that an instruction to deadlocked jury should not "single out minority jurors or encourage those jurors . . . to consider, along with the arguments and the evidence, 'their own status as dissenters' "]; *Butler*, *supra*, 46 Cal.4th at p. 884 [rejecting an argument that a deadlock instruction was coercive where the "court made no reference to the subject of costs, the prospect of a retrial, or the desirability of a verdict"].)

We examine the record to determine whether the trial court "impose[d] such pressure on jurors to reach a verdict" as to leave us "uncertain of the accuracy and integrity" of the verdict. (*People v. Gainer* (1977) 19 Cal.3d 835, 850, disapproved in part on another ground in *Valdez*, *supra*, 55 Cal.4th at p. 163; see also *United States v. Berger* (9th Cir. 2007) 473 F.3d 1080, 1089 [applying de novo review to the question whether a trial court's further instructions to a potentially deadlocked jury improperly coerced a verdict].) "This determination of whether the instructions 'operate to displace the independent judgment of the jury in favor of considerations of compromise and expediency' [citation] is perhaps best characterized as requiring a generalized assessment of the potential effect of a given instruction on the fact finding process, rather than as an attempted inquiry into the actual volitional quality of a particular jury verdict." (*Gainer*, at p. 850.)

Furthermore, " '[t]he secrecy of deliberations is the cornerstone of the modern Anglo-American jury system.' [Citation.] Courts must exercise care

when intruding into the deliberative process to ensure that the secrecy, as well as the sanctity, of the deliberative process is maintained. [Citation.] 'The need to protect the sanctity of jury deliberations, however, does not preclude reasonable inquiry by the court into allegations of misconduct during deliberations.' " (*People v. Russell* (2010) 50 Cal.4th 1228, 1251 (*Russell*).)

Our Supreme Court has "held that the [trial] court ha[s] a duty to investigate an allegation of juror misconduct, emphasizing that 'when a trial court learns during deliberations of a jury-room problem which, if unattended, might later require the granting of a mistrial or new trial motion, the court may and should intervene promptly to nip the problem in the bud. The law is clear, for example, that the court must investigate reports of juror misconduct to determine whether cause exists to replace an offending juror with a substitute.' " (*Russell*, *supra*, 50 Cal.4th at p. 1251, quoting *People v. Keenan* (1988) 46 Cal.3d 478, 532.)

"Penal Code section 1089 gives a trial court authority to discharge a juror, ' "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty . . .." ' A juror who 'refuses to follow the court's instructions is "unable to perform his duty" within the meaning of Penal Code section 1089.' " (*People v. Salinas-Jacobo* (2019) 33 Cal.App.5th 760, 775, italics omitted.)

"[T]rial courts 'must exercise care in responding to an allegation from a deliberating jury that one of their number is refusing to follow the court's instructions or is refusing to deliberate' or is engaging in any form of juror misconduct." (*People v. Nelson* (2016) 1 Cal.5th 513, 569 (*Nelson*).) A "trial court's inquiry into possible grounds for discharge of a deliberating juror

should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations.  The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations.  Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists."  (*People v. Cleveland* (2001) 25 Cal.4th 466, 485 (*Cleveland*).)

"When the trial court receives notice that such cause [to discharge a juror] may exist, it has an affirmative obligation to investigate.  [Citations.]  Both the scope of any investigation and the ultimate decision whether to discharge a given juror are committed to the sound discretion of the trial court."  (*People v. Bonilla* (2007) 41 Cal.4th 313, 350 (*Bonilla*); see *Cleveland, supra*, 25 Cal.4th at p. 478 [" 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court.' "].)

     3.  Analysis

Tapia contends the trial court erred during the jury's deliberation by (1) providing coercive deadlock instructions, (2) coercively questioning the foreperson, and (3) coercively questioning juror No. 3.  We address Tapia's contentions in turn.

On the third day of deliberation (May 6), in response to jury note No. 4 (about the jury's seeming inability to make a decision), the trial court without objection instructed the jurors further based on an instruction affirmed by the Third District Court of Appeal in *Moore*.  (See *Moore, supra*, 96 Cal.App.4th at pp. 1118–1122.)  In his briefing, Tapia acknowledges that in

*People v. Whaley* (2007) 152 Cal.App.4th 968 (*Whaley*), a different panel of this court approved a supplemental jury instruction modeled on the instruction upheld in *Moore* (*id.* at pp. 981–985), and that our Supreme Court cited *Whaley* with approval in *Peoples*, *supra*, 62 Cal.4th at page 784. Tapia provides no persuasive basis for us to reject existing precedent and conclude that the trial court's instant, *Moore*-based instruction coerced the jury. (See *People v. Hinton* (2004) 121 Cal.App.4th 655, 661 (*Hinton*) [describing the *Moore* instruction as "a model for how to instruct the jury following its initial deadlock"].)

Further, we are not convinced that the trial court coerced the jury in responding to juror No. 6's question about how the jurors should "handle a lack of something being presented to" them. As detailed *ante* (pt. II.D.1.c.), the court informed the jurors that the court could not tell them how to deliberate or "get around that" issue. The court further reminded the jurors that the court's instructions were not intended to push the jurors toward any particular verdict, neither party was required to present all potential witnesses, and the parties in a trial routinely engage in a "natural and appropriate" paring of their witnesses for various reasons. Immediately thereafter, the court clarified that "[e]ven with that very natural process, it could mean that the case has not been proved beyond a reasonable doubt because maybe the elements have not been met." Following further comment regarding the ordinariness of the jurors' experience, the court reiterated that if the absence of witnesses "rises to the level of not beyond a reasonable doubt, then it's not beyond a reasonable doubt."

We disagree with Tapia's assertion that the trial court's response to juror No. 6's question conveyed that juror No. 3 "was wrong to be concerned about the absence of corroboration and the majority were right to be ready to

69

convict." Considered in totality, the court's comments appropriately described the relevant law (including the requirement the evidence presented must prove all the elements beyond a reasonable doubt to find Tapia guilty) as well as the realities of the trial process without explicitly or implicitly approving "a movement towards unanimity or otherwise send a message that the holdout juror was to cooperate with the majority." (*Whaley*, *supra*, 152 Cal.App.4th at p. 984.)

We acknowledge that it was inadvisable for the trial court to additionally tell the jurors (at the conclusion of its response to juror No. 6's question) that the court would "probably have [them] keep going" if they remained deadlocked "because of the nature of this case and the cost to the community." (See *People v. Barraza* (1979) 23 Cal.3d 675, 685; *Butler*, *supra*, 46 Cal.4th at p. 884; *Hinton*, *supra*, 121 Cal.App.4th at p. 660.) The court, however, immediately added that the jurors could "take as long as [they] want" and if they could not decide the case, "that is a fair response." Because the court directed the jurors to take the time they needed, reminded them that a hung jury is an appropriate outcome, and did not explicitly reference the prospect of a costly retrial, we decide that the court's concluding remark was not coercive. (See *Brooks*, *supra*, 3 Cal.5th at p. 90 ["Viewing the [trial] court's remarks as a whole, . . . we conclude the jury would not have understood the comments as a warning that failure to reach a verdict would waste both the parties' time and judicial resources."]; *Peoples*, *supra*, 62 Cal.4th at p. 783 [concluding "[t]he trial court's statements to the jury, given the totality of the circumstances, were not coercive" because, "[a]lthough the trial court's statement that 21.5 hours of deliberation was a 'drop in the bucket,' when read in isolation, could be construed as an inducement to reach

70

a verdict, the trial court's complete remarks do not suggest that the court crossed the line from encouragement to coercion"].)

In sum, we conclude the trial court did not abuse its discretion under section 1140 or coerce Tapia's jurors when providing further instructions in response to jury note No. 4 regarding their inability to decide the case and the additional oral question of juror No. 6.

We additionally are not persuaded that the trial court coercively questioned the foreperson or juror No. 3 on the morning of the fourth day of deliberation (May 7). As an initial matter, we decide that the trial court properly exercised its discretion in deciding to conduct an inquiry into whether juror No. 3 was refusing to follow the court's instructions. Juror No. 3's double reference to a retrial in jury notes Nos. 5 and 7 (which he authored), viewed in light of his prior conduct as recounted by the court, provided sufficient reason for the court to suspect that juror No. 3 was refusing to follow the court's instructions. (See *Nelson*, *supra*, 1 Cal.5th at p. 569; *Bonilla*, *supra*, 41 Cal.4th at p. 350; *Cleveland*, *supra*, 25 Cal.4th at p. 478.)

As for the questioning of the foreperson, in accord with the identified potential misconduct, the trial court began by impartially asking whether "somebody's not following the [c]ourt rules and instructions" or "it's just people have a difference of opinion about what is beyond a reasonable doubt." After the foreperson explained his belief that it was "[m]ore the latter" and that a juror seemingly wanted corroborative evidence for certain situations, the court asked the foreperson more specifically why juror No. 3 had sent a second jury note asking about a retrial. The foreperson responded to that question and a further clarifying question by the court in a manner that evidenced some uncertainty about the court's questions and its earlier

71

direction that the jurors should not consider any future decision about a retrial in their deliberation.[31]  Once the foreperson confirmed to the court juror No. 3's desire to know what might happen in a future trial with regard to E.M. and her mother (as stated in jury note No. 5), the court asked two additional questions directed toward learning whether juror No. 3 was the only juror who had a "problem with" the court direction not to consider a potential retrial.  With that, the court ended the inquiry.

Tapia has not persuaded us that the trial court's inquiry of the foreperson amounts to error.  The court's questioning did not exceed the bounds of its sound discretion, was minimally intrusive, and was not coercive.  Rather, the inquiry was limited in scope and focused on obtaining clarity about the potential misconduct of juror No. 3 as to the consideration of a retrial.  The circumstances of the court's inquiry are materially distinguishable from those in *Nelson*—a case relied on by Tapia in his briefing.

In *Nelson*, the trial court committed reversible error by requiring the jurors to complete a broad written questionnaire and orally questioning some of them about their deliberations after they had informed the court they were deadlocked on their penalty phase determination.  (*Nelson*, *supra*, 1 Cal.5th at pp. 561–562.)  Our Supreme Court concluded this procedure impermissibly intruded into the jury's deliberative process, explaining:  "In this case, the trial court went considerably beyond any permissible intervention [for an

---

[31] Regarding jury note No. 5, the foreperson initially said he "forgot" whether the jury had received a response to that note and added, "I think -- I don't think we -- he got the response to his question.  Right?  I don't think he got the response from you officially."  After the trial court read aloud its response to jury note No. 5, the foreperson said that he thought the court's direction "was clear to everybody."

impasse] and took action that undermined the sanctity of jury deliberations and invaded the jurors' mental processes. Based solely on the reported impasse, the court subjected the jurors to a detailed questionnaire that asked them to report on the thoughts and conduct of their fellow jurors— specifically, whether the jurors were refusing to deliberate, whether they were basing their position on anything other than the evidence and jury instructions, and whether they were expressing views about the inappropriateness of the death penalty or life without parole based on anything other than evidence and law. It was clear to the jury that the purpose of this inquiry was to solve the problem of the jury's deadlock, and the inquiry therefore communicated to holdout jurors that their deliberative processes would be reported by fellow jurors and scrutinized by the court. This was improper." (*Id*. at pp. 569–570.) The limited inquiry conducted by the trial court with the foreperson in the instant case is not analogous to that conducted by the trial court in *Nelson*.

The trial court's questioning of juror No. 3 likewise does not amount to an abuse of discretion, impermissible intrusion into the jury deliberation, or jury coercion. The court had sufficient reason to continue its investigation by questioning juror No. 3 regarding potential misconduct based on the jury notes and the foreperson's responses to the court's inquiry. Additionally, the court properly focused its inquiry with juror No. 3 on the two identified areas of his potential failure to follow the court's instructions. The court first asked about the issue of a retrial and why juror No. 3 sent out his second jury note (jury note No. 7) after the court had directed the jurors not to consider the possibility of a retrial. After juror No. 3 provided a somewhat ambiguous answer about wanting to get more information to "make a better decision," the court said it "[u]nderstood" and immediately shifted to the "one witness

73

rule"—a topic that was twice mentioned in jury note Nos. 4 and 6 as a sticking point for juror No. 3.  In the ensuing colloquy, the court obtained confirmation that juror No. 3 accepted the court's instructions that the testimony of a single complaining witness could provide enough evidence to support a conviction and understood that a woman's testimony is evidence.

The trial court did not commit error by examining juror No. 3's potential failure to follow the court's instructions while intruding into the deliberative process as minimally as possible.  The court's inquiry did not cajole juror No. 3 to change his views on the state of the evidence presented or to acquiesce to the views of the other jurors.  Moreover, before sending juror No. 3 back to the deliberation room, the court reiterated that if juror No. 3 "believe[s] that the evidence is beyond a reasonable doubt, [he] would say guilty; if [he] believe[s] the evidence is not beyond a reasonable doubt, [he] would vote not guilty."  Juror No. 3 responded, "Understood."

Under the present circumstances, we conclude the trial court did not err in questioning juror No. 3.  (See *Russell*, *supra*, 50 Cal.4th at pp. 1248–1252.)

E. *Cumulative Prejudice*

Although we assumed error for the purpose of deciding Tapia's claim that the trial court erroneously excluded his testimony about B.M. and E.M. having told him they were trying to obtain visas, we found no prejudice (see pt. II.A.4.b., *ante*), and Tapia has not demonstrated any other error in his trial.  Thus, there are no errors to consider cumulatively.  (See *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

### III.  DISPOSITION

The judgment is affirmed.

_____
Danner, J.

WE CONCUR:

_____
Greenwood, P. J.

_____
Bromberg, J.

**H052446**
***People v. Tapia***